709 So.2d 1044 (1998)
Deborah HOWARD, et al.
v.
ICRR, and the State of Louisiana, Through the Dept. of Transportation and Development.
No. 97-CA-1041.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 1998.
Rehearing Denied May 15, 1998.
*1046 Richard P. Ieyoub, Attorney General, Gus A. Manthey, Jr., Assistant Attorney General, New Orleans, for Defendant-Appellant.
Hugh P. Lambert, Linda J. Nelson, New Orleans, for Plaintiff-Appellee.
Before GRISBAUM, DUFRESNE and CANNELLA, JJ.
DUFRESNE, Judge.
This is an appeal by the Louisiana Department of Transportation and Development (DOTD) from a $1,975,000.00 judgment, reduced 75% for decedent's comparative fault, in this fatal automobile-train collision case. Deborah Howard, decedent's widow, and her three minor children, sued DOTD and the Illinois Central Railroad Company, and DOTD urged a third-party demand against the railroad. Immediately prior to trial, plaintiffs and the railroad confected a Mary Carter agreement whereby the railroad guaranteed plaintiffs a certain sum in return for dismissal of the claims against it. The railroad was to be reimbursed a certain sum in the event DOTD prevailed in its third-party demand, and it also agreed to participate in the trial. After a bench trial, the trial judge found that the railroad was not at fault, but that DOTD was 25% at fault. Because we find no manifest error in the judge's factual findings as to liability and the apportionment of fault, and no abuse of discretion in her award of damages, we affirm the judgment.
In the pre-dawn hours of August 21, 1992, Gus Howard, while driving alone, collided with a black tank car stopped on an unlit railroad crossing and was killed almost instantly. Testimony of several of his friends showed that he had worked an eight hour shift at his chemical plant job, and had met them in the early evening. The group visited various clubs during the course of the evening, but Howard apparently had only three or four drinks of whisky and cola, none of which he was seen to finished. Various people who knew him uniformly testified that he did not drink regularly, and none had ever seen him drunk. There was confused testimony about who drank a half-pint bottle of whisky which one of his friends bought during the course of the night. One version was that he drank about one-third of the bottle (about 3 ounces) in mixed drinks between 7 and 9 P.M., another version put this consumption in a later time period, and yet other testimony indicated that there may have been a second half-pint bottle purchased at about 11 P.M. One empty half-pint whisky bottle was found in the car at the accident scene.
Walter Stevens, one of the group, testified that Howard dropped him off at about 1:30 A.M. and that at that time we did not seem *1047 drunk or impaired and had no trouble driving. John Mitchell, probably the last person to see Howard alive, stated that Howard came into his bar between 1:00 and 2:00 A.M. looking for Mitchell's son. Howard did not appear to him to be drunk, and he did not have anything to drink while there. Howard's whereabouts from then until 3:45 A.M., the estimated time of the accident, are unknown.
The road in question is a straight, 55 MPH, two lane highway, running from the River Road to Airline Highway in Reserve. It had originally been proposed as an evacuation route in the 1980's, but it was also expected to serve as a general purpose roadway. It was designed to provide for a railroad crossing safety device at the Illinois Central railroad crossing, which is about .7 miles from the River Road looking north. That device was to include a cross-buck sign, signal lights, bells, and a gate.
When the road was opened, three weeks before the accident, it was known by DOTD that the signal device had not been completed. The evidence showed that the main post of the apparatus and a cantilevered frame extending over the roadway to support additional overhead warning lights were installed, as well as the standard black and white cross-buck sign. However, the red and white gate was not in place, and neither were any of the lights and bells. Also, photographs taken on the night of the accident show that the entire apparatus reflected light and was clearly visible in headlights. None of the structure was covered with burlap or other cloth as is typically done with inoperable warning signals to indicate to drivers that they are not functioning. It was further shown, however, that there were standard reflecting markers on the roadway itself beginning some 600 feet from the tracks, and a round orange and black railroad sign was in place at about the same distance. There were no lights of any kind at the crossing, and a one-third moon was probably obscured by heavy cloud cover.
Because of the site of the accident, Howard had to have turned north onto the road from the River Road. It was generally agreed by all the experts that had the signal lights been working, Howard would have seen them the moment he made that turn and the accident would not have happened. It was also generally agreed by these experts that Howard was probably traveling at between 50 and 55 MPH as he approached the stopped train. Some 47 feet of skidmarks were on the pavement, and estimates of the collision speed were between 30 and 43 MPH. A non-reflective black tank car was stopped in the crossing with its rear two left wheels in about the center of Howard's lane of travel, and that was the approximate point of impact.
There were no eye witnesses to the accident, but two people in a car who were stopped on the opposite side of the tracks said that they heard the screeching tires and then the collision. Their testimony was that they had approached the tracks from Airline Highway and encountered a train stopped on the tracks. The passenger, Evelyn Brooks, said that as they approached the train she yelled to the driver to watch out and he was able to stop before hitting the tank car. The driver, Rayshawn Stewart, said that he was going about 45 MPH at the time and that the train car was difficult to see. As they sat waiting for the train to move they heard the accident. A few minutes later the train moved away, and they then crossed the tracks and saw Howard apparently dead in his car. Both said they did not notice his headlights prior to the accident, but that the car's taillights were on and the headlights were broken out by the crash. They did not smell alcohol in the car when they looked in to ascertain Howard's condition. They immediately went for help and eventually flagged down a deputy to report the incident.
State Trooper Albert Majeau investigated the accident. He estimated Howard's speed at 55 MPH or less. He noted that the area was dark and rural. He further said that the headlights were on, although he did not recall if he had ascertained that by the switch position or by reference to the tail lights. He noted the empty whisky bottle, but did not smell alcohol.
It was undisputed that the roadway was designed to have a signal device at the crossing, and that DOTD knew that the apparatus *1048 was not yet working when the decision was made to open the road to traffic. It was further shown that the railroad, which was doing the actual installation, was not officially informed by DOTD that the road was to be opened prior to its completion of the warning signals.
Plaintiffs, the railroad, and DOTD each produced an expert at trial. Oscar Franklin Griffith, an expert in physics and accident reconstruction, was called by plaintiffs. His testimony was that judging from the damage to Howard's car, his speed on impact was about 40 MPH. Calculating back through the skid marks, and considering reaction time and the coefficient of friction of the road, he concluded that Howard was probably traveling between 50 and 55 MPH when he first perceived the train, at which point he would have been about 127 from it. He further pointed out that La.R.S. 32:221(2), requires that automobile low beam headlights must illuminate objects at least 150 feet ahead. His calculations were that at 55 MPH, the posted speed on the road, it would take a normal driver about 224 feet to stop from the moment an obstruction was perceived. It was his view that the 55 MPH speed limit should have been reduced to 35 to 40 MPH until the signals were completed.
In addition, he noted that the headlights of the car stopped on the other side of the tracks would have shone under the tank car, causing some problems with visibility as well as giving the impression that there was nothing between it and Howard's car. He explained that the likely reason that Brooks and Stewart did not see Howard's headlights is because their line of sight close up to the tank car would have been obstructed by its base and would thus have extended only several feet onto the pavement across the tracks. However, because of his distance from the train, Howard's line of sight would have permitted him to see the opposing lights until he got within a few feet of the train.
He cited the Manual on Uniform Traffic Control Devices (MUTCD) which directs that the black and white railroad cross-buck signs should be centered at nine feet above the ground so as to give the best reflective visibility for approaching drivers. The cross-buck at the accident scene was instead 13 feet high, but it was shown by other evidence that this position resulted from the fact that the flashing lights were to be installed at the lower height. Nonetheless, Griffith thought that this was a factor in the accident. His ultimate opinion was that the lack of signal lights was the cause of the accident and that the higher than normal cross-buck may have contributed to it.
The railroad called G. Rex Nichellson as an expert in railroad/highway grade crossing design and traffic control systems, highway design and driver behavior at railroad/highway crossings. He noted that railroad crossings are inherently dangerous, and that railroad companies would prefer to avoid them if at all possible. Typically, the building of new crossings requires coordination between the governing authority and the railroad, and the usual arrangement is for the highway department to contract with the railroad for whatever type of signal device the department deems appropriate. The railroad then designs and installs the signal, and the department pays for it. However, the type and placement of all signs are solely within the control of the department, and the railroads have no authority to change these specifications or to decide when to open new roads involving railroad crossings. His opinion was that the present signal was of an appropriate design, and that the railroad had not delayed its installation, but was, in fact, doing the job in less than the normal amount of time.
He, like Griffith, said that the opposing headlights would probably have made it appear to Howard that nothing was between them. He further said that a driver might well perceive the main post and cantilever structure to be a completed signal device and assume that because no lights were flashing it was safe to proceed, especially when seeing unobstructed opposing headlights. He also noted the too high cross-buck, and thought that DOTD should have put a stop sign at the crossing with a stop ahead sign preceding it. His final opinion was that the highway was opened prematurely and this was a cause of Howard's death.
*1049 Richard Glenn Robertson was called by DOTD as an expert in traffic engineering, road design and accident reconstruction. He said that the crossing had proper signs at the time of the accident, including the round railroad sign, the pavement markings and the cross-buck. While admitting that the cross-buck was 13 feet high, rather than the recommended 9 feet, he also pointed out that the MUTCD allows a variance depending on special circumstances. He identified the ongoing construction of the signal device as such a condition. He did admit, however, that unfinished signals should be covered so as not to confuse a driver into thinking that they are operational and thus that it is safe to proceed because no lights are flashing. He also thought that a normal driver would not expect to encounter inoperable signals on this type of highway. He said that a stop sign would have created an even greater hazard because drivers would not expect such a sign on a 55 MPH highway and it might well cause rear-end collisions. His calculations, using a longer reaction time factor than Griffith, showed a stopping distance at 55 MPH of 263 feet. His final opinion was that the road was safe to open, and he noted that the car on the other side of the tracks was able to stop without hitting the train.
Based on the above evidence, the trial judge found that DOTD had breached the standard of care owed to the motoring public by opening the highway before the signal apparatus was completed, and by failing to cover it and erect either a stop sign or yellow flashing lights on saw-horses to indicate ongoing construction. She also found that Howard shared some of the fault for not being attentive and responding to the signs and road markings that were in place. She attributed by far the most fault to Howard at 75%, and only a much smaller amount to DOTD at 25%. She found that loss of income to the plaintiffs was 1.3 million dollars, reduced by $325,000.00 which decedent would have consumed had he lived. General damages were $350,000.00 for Howard's wife, $250,000.00 for his oldest child, and $200,000.00 each for the two youngest children. DOTD's share of the total award came to $493,750.00. It now appeals that judgment.
DOTD advances 19 assignments of error. However, many of these errors involve a similar analysis and the court groups them accordingly to avoid repetition. Nine of the assignments relate to factual determinations made by the judge. The standard of review of factual determinations is whether they are clearly wrong or manifestly erroneous. In Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993), the court reiterated that application of the manifest error standard involves a two part inquiry for reversal of factual findings. First, the court must determine that a reasonable factual basis does not exist for the trial court finding. Then the court must further determine that the entire record establishes that the finding is clearly wrong.
It is also well established that in delictual actions a plaintiff must show causation, a duty on the part of the defendant, breach of that duty when the risk of the harm was within the scope of its protection, and consequent damages, Molbert v. Toepfer, 550 So.2d 183 (La.1989). In the context of highway safety, DOTD owes a legal duty to the prudent motoring public to design and construct its highways safely, and to erect proper signs, Id. And while the duty owed is a legal question, breach of that duty is a factual matter, Berry v. State, Through DHHR, 93-C-2748 (La.5/23/94); 637 So.2d 412.
In the present case, the ultimate factual inquiry was whether DOTD breached its duty to maintain safe roads when it opened the highway in question prior to completion of the railroad safety signals, and without erecting any other warning signs to indicate that the partially completed device was not working. In her extensive reasons for judgment, the trial judge found that DOTD opened the highway before it was safe to do so, and then failed to post additional warning lights or a stop sign, or to cover the incomplete signal post and cantilever, as recommended by its own expert, so as not to lull drivers into a false sense of confidence that there was no train. She noted that these measures could have been undertaken at little expense because the department had such warning lights and equipment on hand.
*1050 As the above summary of the evidence shows, there was ample testimony to support these conclusions. A reasonable view of the evidence shows that Howard was driving with his low beams on, that he saw headlights apparently approaching him with no obstruction between him and them, and that he saw the reflective post and cantilever, but no flashing lights. Further, both plaintiffs' and DOTD's experts testified that at 55 MPH, the posted speed limit, a driver would need 224 or 263 feet respectively to stop. The applicable statute requires a minimum low beam effective range of 150 feet. Although it was not known what the exact range of Howard's low beams was, nonetheless the DOTD is presumed to know the law and to proceed under the assumption that legal low beams reach only 150 feet and to post commensurate speed limits or otherwise use permanent or temporary warning signs.
DOTD's original design of the road required use of a full railroad crossing safety device, as well as signs and reflective pavement warnings, apparently because it deemed them essential to safety. It nonetheless opened the road before the signals were completed, and moreover did not cover the uncompleted device, a precaution deemed normal by its own expert, nor provide any other warning lights or signs. Considering the evidence of record, we can only conclude that it provided a reasonable basis for the trier of fact's findings that the crossing was unsafe when the road was opened, that other precautions should have been undertaken, but were not, and therefore that DOTD breached its duty to Howard to maintain safe highways. It is evident, of course, that this duty encompassed the risk of the harm suffered by Howard, and that there were consequent damages.
DOTD urges three assignments relating to experts. It contends that Griffith, plaintiffs' expert, should not have been qualified as an expert in accident reconstruction. We disagree. This physics Ph.D. stated that he has done accident reconstruction work for 18 years, has testified as such over 100 times, and has done over 1,000 studies of accidents over the years. He further said that accident reconstruction is basically done with knowledge of the principles of physics. On this showing, it was not error to qualify this expert in that field.
DOTD further asserts that it was also error to let Griffith offer opinions as to traffic engineering. The testimony referred to concerns the MUTCD recommendations as to stop signs at railroad crossings, to which Griffith referred in stating that he thought a stop sign was called for. Although that testimony was admitted in part, the trial judge pointed out in response to counsel's objection that the manual itself was in evidence and that she could read it. It is also evident from her reasons for judgment that the trial judge faulted DOTD in part for not putting up a stop sign not because of the MUTCD manual, but rather because of La. R.S. 32:172, which she quoted. That statute provides that "[t]he department may designate particularly dangerous highway grade crossings of railroads and erect stop signs thereat." A third assignment, this one concerning Nichellson, the railroad's expert, is similar to that made against Griffith, i.e. he was improperly allowed to give an opinion as a traffic engineer on the propriety of a stop sign at the crossing under the MUTCD. We reject this assignment for the reasons just given as to Griffith's testimony.
DOTD next contends that its right to a fair trial was prejudiced by the collaboration of plaintiffs and the railroad under a Mary Carter agreement, and argues that such arrangements should be ruled as against public policy. As far as we can determine, the Louisiana Supreme Court has addressed the question of Mary Carter agreements only once, and then obliquely. In Rick v. State, DOTD, 93-C-1776, 93-C-1784 (La.1/14/94); 630 So.2d 1271, the court held that La.C.E. Arts. 408 and 413, prohibit introduction of compromise agreements or amounts paid to settle claims. Although the opinion does not identify the excluded settlement as a Mary Carter agreement, that is how it was described by the appellate court when the case was before it, Rick v. State, Through DOTD, 619 So.2d 1149 (La.App. 1st Cir.1993). More recently, in Stockstill v. C.F. Industries, Inc., CA 94 2072 (La.App. 1st Cir. 3/15/95); 665 So.2d 802, the court approved *1051 of a jury instruction to the effect that plaintiff and one defendant had settled the matter between themselves and were now aligned together in the case, and that the settling defendant now had a financial interest in plaintiff's recovery. It reasoned that his information went to bias or interest of witnesses. It also upheld the trial judge's ruling that the specific terms of the Mary Carter agreement relating to reimbursement and the amount of the settlement would not be given the jury, citing La.C.E. Arts. 408 and 413.
In the present matter, a judge trial, the judge and DOTD were informed on the first day that a Mary Carter agreement had been struck, and that the parties were now realigned. Thus, any potential bias or interest of witnesses was known to everyone. DOTD argues further, however, that because of the reimbursement provisions of the agreement, the railroad was no longer a party to the suit, and therefore it should have been precluded from participating in the trial. However, the railroad remained a defendant as to DOTD's third-party demand, and as such was still a party.
As to the assertion that Mary Carter agreements should be deemed as against public policy, as noted above our supreme court has at least tacitly declined to make such a ruling, Rick v. State, Through DOTD, supra. It is this court's opinion that such settlements are not against public policy, absent legislation to the contrary, and we so hold.
In a related matter, DOTD asserts that because of the parties' realignment, it was prejudiced by the railroad's decision not to call two of its witnesses who allegedly were to testify about railroad workers present at the scene when the road was opened and the railroad's ability to have completed the signal device within the time the road opened and the accident occurred. The background of this situation was that the trial was originally estimated to last one week, but because of extensive argument by counsel for all parties, the matter could not be completed in the time allotted. On the last day of that week the trial judge reset the remainder of the case for the following month. She also ordered counsel to name any witnesses that they intended to call. DOTD did not then name the witnesses at issue here, both of whom lived out of state. When the railroad named them, DOTD objected on grounds that although they were on the pre-trial witness list, the railroad did not have them on hand on the last day of the first week, when the trial was supposed to end. It argued that to allow the railroad to produce them later would be prejudicial. The railroad then agreed that it would not call the two witnesses.
When trial resumed a month later the railroad did not produce these people, and DOTD thereupon sought to introduce their discovery depositions in lieu of live testimony. Counsel for the railroad objected on grounds that, for routine tactical reasons, when the depositions were taken during discovery she did not question her own potential witnesses. Were the depositions admitted, she would, in effect, be denied the right to question these witnesses. The trial judge refused to admit the depositions because the witnesses had not been named by DOTD when ordered to do so.
We find no error in the action of the trial judge. A trial judge has wide discretion in excluding witnesses who are not properly listed in pre-trial orders. While this incident did not arise out of the pre-trial orders per se, the trial judge unambiguously informed counsel at the end of the first week that witnesses not named at that time would not be permitted to testify when the trial resumed. Moreover, it is evident that the railroad initially named these witnesses at the close of the first week, but DOTD objected to their being called and the railroad withdrew those names. Finally, it does not appear that DOTD made any efforts to procure the attendance of these witness, or to inform the court of the problem, during the one month break in the trial. Considering all of these circumstances, we find no abuse of the trial court's discretion in excluding the depositions.
DOTD also urges that certain admissions made by it to plaintiffs during discovery should have been accepted by the trial judge *1052 as binding, and upon which no further testimony should have been allowed, citing La. Code Civ.Pro. Art. 1468. Although it is difficult to ascertain precisely which of the thirty plus admissions are at issue, it appears that the only pertinent ones again relate to the railroad's knowledge of the opening of the road. The difficulty with DOTD's argument, however, is that these admissions were not made by the railroad, but rather by DOTD itself. In this circumstance, it can hardly be argued that these admissions should be binding on a party not making them.
In its next assignment, DOTD urges that the trial judge erred in her apportionment of fault. Again we disagree. In Watson v. State Farm Fire and Cas. Co., 469 So.2d 967 (La.1985), the court ruled that percentages of fault are factual determinations subject to the manifest error standard of review. It also set forth a number of factors to be considered in making such factual findings, including:
[W]hether the conduct resulted from inadvertence or involved an awareness of the danger, 2) how great a risk was created by the conduct, 3) the significance of what was sought by the conduct, 4) the capacities of the actor, whether superior or inferior, and 5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. (At 974)
In her reasons for judgment, the trial judge recited all of these factors and the evidence going to each, and made the factual determination that Howard was 75% at fault and DOTD 25% at fault. There is ample support in the record for this apportionment of fault, and therefore there can be no manifest error in these factual findings.
In a related assignment of error, DOTD contends that it was manifest error for the trier of fact not to find that Howard was impaired by fatigue and alcohol. The facts as to his alcohol consumption have been summarized above and will not be repeated in detail here. It is sufficient to point out that a hypothetical was given to DOTD's toxicologist, Dr. William George, wherein he was to assume that between seven P.M. and 9 P.M., Howard drank three ounces of whisky, and between 9 P.M. and 1 A.M. he had all of three one and one-half ounce whisky drinks. His opinion on these facts was that Howard's blood alcohol level at 3:45 A.M. would have been less than the equivalent of one drink. That hypothetical was certainly in accord with a version of events found in the cumulative testimony of the witness who were with him on the night in question, and an ultimate finding that Howard was not shown to have been impaired by alcohol is one that clearly has a basis in the evidence.
The final issue here concerns quantum, which DOTD asserts is excessive. The standard of review of damages is whether the court abused its much discretion in fixing the award, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). In Youn, the court set forth the long standing rule that the role of an appellate court is not to decide what it considers an appropriate award, but rather to review the exercise of discretion by the trier of fact. It went on to reiterate that consideration must first be given to the particular injuries and their effects in the particular circumstances of the particularly plaintiff. Only if an appellate court determines, for articulable reasons distinct to the case at hand, that the trier of fact abused its much discretion, may it set aside an award as either too high or too low.
In the present case, there was expert testimony by plaintiffs' economist that Howard's lost wages were between 1.3 and 1.6 million dollars. DOTD's economist put the figure in the .6 million range. The trial judge awarded 1.3 million for this item, but reduced it by $325,000.00, representing the amount that the decedent would have consumed had he lived. Clearly, this element of damages was well supported by the evidence, and did not constitute an abuse of discretion. As to general damages, there was evidence that the Howard family was close and that decedent was very active with his children. *1053 After his death, his widow became withdrawn and depressed, and the eldest son exhibited similar symptoms. The two younger children were not so affected, but they nonetheless lost their father. Considering the totality of the circumstances in this case, we are unable to articulate any reasons why the awards of general damages made by the trial judge to a surviving widow and her children are excessive. We therefore must affirm those awards.
For the foregoing reasons, the judgment of the district court is hereby affirmed.
AFFIRMED.