721 So.2d 1026 (1998)
Yvonne V. DUFRENE, Individually and as Administrator of the Estate of Dennis L. Dufrene, Shane Michael Dufrene, and Jessica Leigh Dufrene
v.
John W. WILLINGHAM, U.S.F. & G. Insurance and the State of Louisiana, Though the Department of Transportation and Development
No. 97-CA-1239.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 1998.
Rehearing Denied December 14, 1998.
*1028 Daryl A. Higgins, Thomas W. Darling, Windhorst, Gaudry, Ranson, Higgins & Gremillion, Gretna, for plaintiffs-appellees.
Gus A. Manthey, Assistant Attorney General, New Orleans, for defendants-appellants.
E. Peter Urbanowicz, John A. Lovett, Lance P. Martin, Liskow & Lewis, New Orleans, for intervenor-appellee2nd appellant.
Charles A. Boggs, Edward A. Rodgigue, Anne E. Medo, Boggs, Loehn & Rodrigue, New Orleans, for defendant-appellee.
Before GAUDIN, GRISBAUM and WICKER, JJ.
GAUDIN, Judge.
In this highway accident case, a trial judge in the 24th Judicial District Court found the Louisiana Department of Transportation and Development 80 percent negligent and a motorist 20 percent responsible for a two-vehicle collision on U.S. Highway 90 near Mosca's restaurant just west of Westwego, Louisiana.
According to the assigned reasons for judgment, the DOTD was partially cast in judgment because it permitted an unreasonably dangerous left-turning area to remain in place while the motorist, John Willingham, was also found partially at fault because of his inability to control his 1988 Ford pickup truck, which jumped a median and crashed headlong into an automobile coming from the opposite direction.
The trial judge stated that the DOTD was in a "superior position to prevent this accident;" consequently, the DOTD's percentage of fault was greater that Willingham's.
For the following reasons, we affirm the allocations of fault and the monetary awards made and we remand for a determination of a subrogation claim by Ochsner Health Plan.
It was dark at about 6:30 p.m. on December 7, 1990 when Willingham was driving his pickup truck westerly on four-lane U.S. 90. He was in the far left west lane, the one adjacent to a neutral ground dividing the roadway's eastand west-bound lanes. As he approached the spot where the restaurant is located, he saw a stopped automobile waiting to execute a left turn. The rear of the car protruded several feet into the highway's far left west-bound lane, the one Willingham was approaching in.
Probably in an attempt to avoid hitting the stopped vehicle, Willingham swerved to his right and crossed all the way over to the shoulder of the highway. He then turned sharply back to his left. His truck went past and in front of the protruding auto and into the east-bound lanes, where it ran headlong into a 1987 Plymouth Voyager van driven by Dennis Dufrene. Dufrene was fatally injured and his wife Yvonne, a passenger in the right front seat, badly hurt.
Mrs. Dufrene sued for herself and on behalf of the couple's two minor children. A bench trial was held on August 4, 5, 6, and 7, 1997. The trial judge awarded Mrs. Dufrene $300,000.00 for the wrongful death of her husband, $860,000.00 for past and future pain and suffering, scarring, etc., $50,000.00 for *1029 future mental pain and suffering, $143,460.86 for past medical expenses, $7,500.00 for future medical expenses, $317,972.53 for loss of past support and $513,746.86 for loss of future support, a total award of $2,192,680.25.
In addition, the trial judge awarded $200,000.00 to each of the Dufrene children, Shane and Jessica.
The August 21, 1997 judgment also (1) limited USF & G's liability to $50,000.00, the amount of its insurance policy issued to Willingham, (2) said the Ochsner Health Plan's subogation claim of $127,893.67 could not be satisfied until Mrs. Dufrene "has received full compensation from defendants," and (3) required Willingham, USF & G and DOTD to pay legal interest from date of judicial demand and all court costs.
On appeal, the DOTD specified numerous district court errors contending, generally, that neither the slope of the highway nor the highway's left turn set-up near Mosca's restaurant was a cause in fact of the accident but that Willingham's speed, inability to control his pickup truck and his intoxication made him solely at fault. Also, the DOTD says the monetary awards were excessive.
Also now before this Court are (1) Mrs. Dufrene and her children, saying that proof of the DOTD's negligence was "overwhelming" and that U.S. 90's reputation as "Louisiana's blood highway is well known;" (2) Willingham and his insurance company USF & G, contending that Willingham was neither intoxicated nor negligent; and (3) the Ochsner Health Plan, arguing the trial judge erred in relying on the "make whole" doctrine instead of the express language of the Ochsner-Dufrene contract.
The DOTD's 29 assignments or specification of error can be consolidated as follows:
(1) the 18-page "Findings of Fact and Conclusions of Law" signed by the trial judge were not his but instead were almost a verbatim repetition of plaintiffs' post-trial brief;
(2) the trial judge erred in allowing plaintiffs' accident reconstruction witnesses, Dr. Olin K. Dart Jr. and Colonel Joseph H. Andre, to testify as experts, in violation of procedural guideline set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993);
(3) the traffic report was wrongly excluded from evidence;
(4) DOTD witnesses Dr. Richard Warren, Jerry Harrison and Ms. Linda Boyd were improperly prohibited from testifying about Willingham's intoxication because adequate notice had not been provided;
(5) the trial judge's findings of fact were manifestly erroneous;
(6) the DOTD's negligence was not a cause in fact of this accident, and
(7) the damage awards were grossly excessive.
We shall consider, in order, these assignments of error.

ASSIGNMENT NO. 1
Although a trial judge adopts most or almost all of a party's suggested reasons for judgment, the reasons and the judgment itself will stand as long as the record supports them. In Lancaster v. Petroleum Corp. of Delaware, 491 So.2d 768 (La.App. 3 Cir. 1986), the court said at page 773:
"Though it is not a common practice in Louisiana for the trial court to allow counsel to prepare the Court's reasons for judgment, it is an accepted practice. [See J. Lemmon's dissent in Miller v. Smith, 402 So.2d 688 (La.1981)]. This procedure is also permitted in Federal courts, and the United States Supreme Court has stated that where counsel has prepared the Court's reasons for judgment:
`Those findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence.' United States v. El Paso Natural Gas Company, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12, (1964).
"See also, Cooper v. Keyes Offshore, Inc., 421 So.2d 385 (La.App. 1st Cir.1982)."
This alleged trial court mistake is devoid of reversible error.

*1030 ASSIGNMENT NO. 2
Here, the DOTD argues that neither Dr. Dart nor Colonel Andre was sufficiently qualified or knowledgeable and that their conclusions and opinions should not have been relied on by the trial judge.
Daubert was a complex medical case in which a pharmaceutical company was sued for alleged birth defects sustained as a result of the mother's ingestion of an anti-nausea drug. The trial judge, the United States Supreme Court stated, must make a preliminary assessment of an expert's testimony and decide if the reasoning and methodology are valid enough for application to the facts at issue. Many considerations, the Court said, should bear on the inquiry. Louisiana adopted Daubert in State v. Foret, 628 So.2d 1116 (La.1993), and other cases.
LSA-C.E. art. 702 sets forth the general rule for the admissibility of expert testimony in Louisiana:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Dr. Dart has advanced degrees from Cornell University and Texas A & M which, he said, "have major emphasis in the field of traffic engineering and highway design." He has been an author and a consultant for 30 years, having testified many times in court as an expert in accident reconstruction.
Colonel Andre has a diploma from Northwestern University in Illinois and was with the state police for 18½ years, serving at one time as commander of Troop A. He retired in 1973. He has been testifying in state and federal courts as an expert witness since 1966 and as an expert in accident reconstruction since 1984. Prior to becoming commander of Troop A, he investigated highway accidents as a state trooper for 7½ years. Colonel Andre has been attending and conducting seminars since 1964.
Both Dr. Dart and Colonel Andre visited the accident scene, made measurements and examined statements, photographs, etc. Dr. Dart said that the median opening, where the stopped car was in, was 68 feet in length. The median was 11½ feet wide on the east side, nine 1/2 feet wide on the west side. The stopped automobile in the median was a Chrysler being driven by Joel Borrello.[1] It was 17 feet, two inches long.
Dr. Dart stated:
"My opinion is that he (Willingham) perceived the (Borrello) vehicle blocking his path, executed athis right-hand swerve, realizing he was about to go off the road completely, and put in left-hand steering sufficiently to put his vehicle back towards the road, and unfortunately overcorrected and sent the vehicle into the median, such that it vaulted the median and struck the plaintiffs' vehicle head-on."
Not having an adequate left turn area produced the accident-causing blockage, Dr. Dart said. If the left turn bay had been longer, the accident would not have happened, he added.
Dr. Dart said that a car could safely store in the median at a slow speed. Apparently, however, Borrello entered the median at a normal highway left-turning speed which left the rear of his car protruding onto the westbound roadway.
In Colonel Andre's opinion, Willingham swerved to the right because Borrello's auto was blocking, totally or partially, his (Willingham's) lane of travel.
As Willingham neared the Mosca median, he drove across an elevated section of U.S. 90. The top of the elevated section (on bridge) was 270 feet from the closest edge of the median. If Willingham was going an estimated 60 miles per hour, Colonel Andre said, the braking distance, taking into account a reaction time of between one and two seconds, would be 354 feet.
Because Borrello's car was on an angle, Dr. Dart said, its taillights would been difficult to see. Another factor, according to *1031 Colonel Andre, was the fact that at least one east bound vehicle (Dufrene's) was approaching with headlights on. From Colonel Andre's testimony:
"If he's (Willingham's) got on-coming headlights in his eyes, and he doesn't see the (Borrello) vehicle until his headlights shine on the vehicle, which is a distance of 150 feet, he could not safely do a lane change. In fact, he couldn't do a lane change and maintain control.
"I think initially when he jerked it he was closer than 150 feet of the (Borrello) vehicle, and he jerked the vehicle to avoid Mr. Borrello's vehicle and from there on he was out of control, because of the fact that he had to jerk the wheel so hard."
We cannot say, from the record, that the trial judge erred in accepting Dr. Dart and Colonel Andre as expert witnesses and in finding the reasoning and methodology of each witness reliable and relevant. Both witnesses had enough information about the accident to base their respective opinions on. There is no wording or guideline in Daubert or Foret that would have prevented Dr. Dart or Colonel Andre from testifying as experts, although admittedly both were "hired guns" as many (if not most) expert witnesses are.

ASSIGNMENT NO. 3
The DOTD argues that the trial judge erred in excluding the traffic report from evidence. LSA-C.E. art. 803(8)(b)(i) clearly states that investigative reports by police or other law enforcement personnel are excluded from the exception to the hearsay rule.

ASSIGNMENT NO. 4
The DOTD contends that three of its witnesses, Dr. Richard Warren, Jerry Harrison and Ms. Linda Boyd, were erroneously prevented from testifying about Willingham's alleged intoxication because the other parties in this lawsuit had not been properly notified. Willingham was in a coma for several days after the collision and he could not, he said, recall anything he saw just prior to the accident. He did remember, however, drinking three beers between 1:30 p.m. and 4:30 p.m. on the date of the accident.
Dr. Warren, a neurologist, treated Willingham at West Jefferson Hospital after the accident. Willingham's blood alcohol level was .213, according to Dr. Warren's proffered testimony. Harrison, who also testified under proffer, was a toxicologist at the state police crime laboratory. He said that Willingham's blood sample was delivered to the crime lab on December 12, 1990 by mail and received by Ms. Boyd. The blood sample, drawn at 10:32 p.m. the night of the accident, indicated .13 grams present of alcohol, which was over the legal limit of .10.
Dr. Warren and Harrison were identified by the DOTD as potential expert witnesses on July 30, 1997 two business days before the trial started. The trial judge found this late notification to be prejudicial and deemed the testimony of these witnesses inadmissible.
The DOTD contends that this was error because the other parties knew that proof of Willingham's drinking was to be forthcoming as a defense. Plaintiff attorneys had discussed Willingham's blood alcohol content with Colonel Andre before his discovery deposition. The DOTD's expert in accident reconstruction, David Hall, said in his pretrial deposition that he considered Willingham's intoxication a cause of the accident. All records, including Dr. Warren's report, were available to counsel in March, 1993. Further, in their original petition, petitioners named Willingham as a defendant and alleged intoxication. Willingham subsequently filed a cross claim against the DOTD.
The DOTD also points out that Willingham had pled nolo contendere to vehicular homicide under LSA-R.S. 14:32.1. Such a plea, however, is not a guilty plea and has no effect beyond the case in which it is entered, Shephard on Behalf of Shepard v. Scheeler, 701 So.2d 1308 (La.1997).
In October, 1994, pursuant to LSA-C.C.P. art. 1425, the Dufrenes sent the DOTD a set of interrogatories requesting information on experts expected to testify. The DOTD named Hall as an expert witness but not Dr. Warren or Harrison. The DOTD did not specifically allege Willingham's intoxication in either its response to Willingham's cross *1032 claims or in its answer to Dufrenes' supplemental and amended petition although the DOTD did affirmatively plead as a defense any acts of negligence and/or disregard of safety shown and proven at trial. The DOTD's claim that it submitted a list of evidence in August, 1996, is unsupported by the record. The purported list is neither dated nor signed.
What is clear from the record is that the pretrial order issued by the trial judge directed all parties to complete discovery by March 19, 1997. Except for good cause, the order stated, only listed expert witnesses would by allowed to testify. Under LSA-C.C.P. art. 1425, the trial judge had specific statutory authority to issue such an order. The article says that any party may require any other party to identify each person the other party expects to call as an expert witness at trial and to state the subject matter and substance of facts to which the expert is expected to testify. The late naming of Dr. Warren and Harrison as experts was in violation of the court order.
Whether or not witnesses, expert or otherwise, are permitted to testify is within the trial judge's discretion. Only when this discretion is abused is such a decision reversal on appeal. See Buxton v. Evans, 478 So.2d 736 (La.App. 3 Cir.1985), writs denied at 479 So.2d 921 (La.1985), and other cases with similar holdings. Here, we cannot say the trial judge abused his discretion, inasmuch as his pretrial order was not complied with.
Nonetheless, we have reviewed the proffered testimony of Dr. Warren and Harrison, as did the trial judge before rendering his judgment on the merits. The trial judge, in his "Reasons," said:
"The Court does not find any competent evidence put forth by the DOTD with regard to Willingham's consumption of alcohol on the day of the accident was a cause of the accident. DOTD presented no competent testimony or evidence either through proffer or otherwise that this accident was caused by any alleged intoxication of John Willingham. Furthermore, the DOTD presented no witnesses, either though proffer or otherwise, to interpret any results of a blood alcohol test. As stated by the Louisiana Supreme Court in Judd v. State, Dept. of Trans. & Development, 95-1052 (La.11/27/95); 663 So.2d 690, 695, `the proponent of the BAC [blood alcohol content] test results must produce expert testimony to interpret those results because a presumption of intoxication is not available and without expert testimony to interpret the results, they will have very little evidentiary weight.' DOTD did not produce any expert testimony to interpret the results of any blood alcohol content tests. Therefore, even if DOTD had complied with the statutory requirements in obtaining the certified records of John Willingham, they would have provided ` very little evidentiary weight,' without expert testimony to interpret these results. The proffered testimony of Mr. Harrison of the State Police Crime Laboratory and Dr. Warren did not address the influence of alcohol in causing this accident. Neither was qualified to even render such an opinion."
In any event, the failure of the DOTD to adhere to the February 28, 1997 discovery order justified the exclusion of experts not listed and was within the trial judge's discretion.

ASSIGNMENTS NOS. 5 AND 6
In these specifications of error, the DOTD argues that the trial judge's findings, particularly those regarding the DOTD's negligence, were manifestly wrong.
The DOTD denied that a dangerous or defective left-turning condition existed and that if one did exist, which was expressly denied, the DOTD had no notice and was therefore deprived of sufficient time to repair the defect. The DOTD further argues that the accident was caused solely by Willingham's negligence.
The DOTD owes a duty to maintain its highways in a condition that does not present an unreasonable risk of harm. See Oster v. DOTD, 582 So.2d 1285 (La.1991); also Aucoin v. DOTD, 712 So.2d 62 (La. 1998), wherein the Louisiana Supreme Court also said this at page 65:

*1033 "Breach of duty and reasonableness of the risk depend on the facts and circumstances of each case. Manasco v. Poplus, 530 So.2d 548 (La.1988); Hunter v. DOTD, 620 So.2d 1149 (La.1993). The standard of review is manifest error in cases where unreasonable risk of harm is at issue. Reed v. Wal-Mart, Inc., 97-1174 (La[.]3/4/98), 708 So.2d 362. The trial court's findings are reversible only when there is no reasonable basis for the conclusions, or they are clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987)."
The DOTD has no ironclad duty to reconstruct all existing highways to meet new or so-called modern standards. See Holloway v. State, Through DOTD, 555 So.2d 1341 (La.1990), and Myers v. State Farm Mutual Automobile Insurance Co., 493 So.2d 1170 (La.1986). However, Louisiana law provides two theories under which the DOTD can be held fully or partially liable in accident cases as this. It can be placed in judgment if negligent, under LSA-C.C. art. 2315, or if strictly liable, under LSA-C.C. art. 2317. Under either theory, a successful plaintiff must show that the thing which caused the damage was in the custody of the DOTD, that the thing was defective because it had a condition which created an unreasonable risk of harm, that the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time and that the defect was a cause in fact of injuries sustained. See Lee v. State, Through Dept. of Trans. and Dev., 701 So.2d 676 (La.1997); Hunter v. Dept. of Trans. and Dev. supra; Howard v. ICRR, 709 So.2d 1044 (La.App. 5 Cir.1998), writs denied (September 25, 1998) and LSA-R.S. 9:2800.
In Howard, this Court said at page 1049:
"...in delictual actions a plaintiff must show causation, a duty on the part of the defendant, breach of that duty when the risk of the harm was within the scope of its protection, and consequent damages; Molbert v. Toepfer, 550 So.2d 183 (La.1989). In the context of highway safety, DOTD owes a legal duty to the prudent motoring public to design and construct its highways safely, and to erect proper signs. And while the duty owed is a legal question, breach of that duty is a factual matter, Barry[Berry] v. State, through DHHR, 637 So.2d 412 (La.1994)."
In the instant case, the trial judge made various findings of fact concerning the causes of the sued-on accident and he traced the history of U.S. 90 at the accident site. In his "Reasons for Judgment," he stated:
"At the time of this accident, U.S. 90 was a four lane unrestricted access highway. The construction of U.S. 90 began in the late 1930s when a 200-foot right of way was obtained by the Department of Transportation and Development.
"In 1937-39, Project No. 05-10-02, a 60-foot embankment was placed in the center line of the 200-foot right of way in the seven mile stretch from Bridge City to after the St. Charles Parish line on the Westbank of Jefferson Parish.
"In 1941, under Project 05-10-04, a shoulder and two lanes of travel were constructed on the north side of the embankment providing for both single lanes of travel for east and westbound traffic on U.S. 90.
"In 1942, the Louisiana legislature passed Act 4 which became law and provided in § 38 that, `in the location and design of highways it shall be the duty of Department to adopt and employ the best modern practice in the interest of safety and convenience of the traveling public.'
"In 1943, the DOTD's approved standards provided for a median width of a minimum 40-feet in the design of a four-lane roadway.
"By Acts 1944, Act 65 the Louisiana legislature re-enacted § 38 of Act 4 of 1942 requiring that DOTD `adopt and employ the best modern practices in the interest of safety and convenience of the motoring public in the design of highways.'
"In 1948, the DOTD's road design standards called for a minimum 30-foot median on a four-lane partially or wholly unrestricted access highway.
"In 1940, the American Association of State Highway Officials (AASHO), an organization comprised of highway officials and traffic engineers from around the nation, recognized that `median strips should be wide *1034 enough at the intersections to accommodate left and U-turning vehicles.'
"AASHO was, and still is today, recognized as setting forth standards to follow in the design of highways. In 1940, the desirable width of median strips at grade crossings was at least 25 feet for passenger car type of traffic. AASHO regulations state that if the desirable width of the median cannot be obtained, the median width may be reduced to 19 feet for passenger type car traffic.
"In 1945, AASHO standards were that the minimum width of a median in a rural area must be 15 feet with a desirable width of 40 feet. The area of this accident is rural today and certainly was rural in 1951.
"In 1951, Project Number 05-10-07 called for both the construction from St. Charles Parish line to Bridge City of a median, twolanes of traffic, a shoulder, and for the major reconstruction and renovation of the existing two-lanes of travel along U.S. 90. The standard length of a cross-over was originally designed for 36 feet in exhibit P-13, however the length was changed to 75 feet in 1951. As part of Project 05-10-07 in 1951, a crossover was built in the vicinity of Mosca's restaurant.
"Because the originally designed embankment of 60 feet was not wide enough to accommodate the median, two new lanes of travel and the new shoulder, the embankment was widened by four feet in the 1951 project. Even after the additional embankment was added, the DOTD still had over 130 feet of right of way available for `spot' widening of the roadway at the five crossovers being built in 1951. The 1951 project constituted major construction of a new phase of the roadway and major reconstruction of the existing roadway, therefore the DOTD's duty was to follow the standards in place in 1951.
"The DOTD presented no evidence to explain why in 1951 the DOTD did not design the median width to meet the minimum standards as set forth by AASHO in 1940, or the DOTD's own standards of 1942. As admitted by the DOTD's expert, David Hall, the reason for the 200-foot purchase of the right of way was the recognition the U.S. 90 would be `spot' widened and upgraded for design of fully protected U-turn and/or left-hand turn storage lanes.
"There was no evidence presented by the DOTD that there were any budgetary constraints in 1951 restricting or prohibiting the DOTD from building a highway to existing design standard in compliance with the 1942 and 1944 legislative acts, AASHO standards, or the DOTD's own standards calling for a minimum 30 foot median. Additionally, there was no testimony from the DOTD on why they did not upgrade the median to existing standards after the 1955 legislative act declaring that existing roadways `shall be brought up to the standards of construction established by the Board of Highways'. Nor was there any testimony from DOTD on why they did not comply with the mandate found in the letter from the chief engineer of the DOTD dated July 20, 1955 that the recently enacted Highway Legislation requires that we set up standards for the A and B Systems and that these routes in the A and B Systems be improved to these standards. U.S. 90 was a class A roadway in 1955 and the standards set up as a result of the 1955 legislation required a median width of 30 feet.
"Both plaintiff and DOTD's experts in road design agreed the purpose of providing a median width sufficient to protect a leftturning motorist was to provide a place of safe refuge for the turning motorist and prevent the vehicle from creating an impediment and hazard to the vehicles traveling in the inside travel lane of traffic. The current standards and purpose of the median found in the 1990 version of AASHO are almost exactly the same as found in the 1940 standards.
"The area of roadway in the vicinity of Mosca's restaurant remained virtually unchanged from 1951 until 1986 when the Parish of Jefferson constructed a new road intersecting with U.S. 90 initially named Modern Farms and renamed Live Oak. When Modern Farms/Live Oak was connected to U.S. 90 in 1986, a left-hand turn lane was added in the eastbound roadway of U.S. 90 and the median eastbound was widened to accommodate the left-turn lane. At the time of the *1035 above stated connection, the median opening by Mosca's was slightly widened resulting in a median width of approximately nine feet wide on the eastern side of the median opening and 11 feet wide on the western side. At no time relevant herein were there any prohibitions to either east or west bound motorists from turning into the median to `cross over' or make a U-turn at the Mosca's cutout.
"Based on the testimony of Boyd Gauthreaux, for several years prior to the December 7, 1990 accident, the DOTD was aware that the narrow median configuration was inadequate and this configuration had caused several fatalities in the stretch of U.S. 90 from Boutte to Bridge City. Based upon the deposition testimony of Juan Shelby, he has responded to numerous accidents in his sixteen years with the WKB Fire Station in which a left-hand turning motorist blocking the left-hand travel lane caused accidents. Juan Shelby testified that turning vehicles are unable to get out of the fast travel lane which attempting left hand turns on U.S. 90.
"A cause of the accident was the narrow median width which required the Borrello vehicle to block a portion of the left travel lane. This blocking of the left hand lane set into action the one continuous event which caused the damages.
"Also causing this accident was the obstruction to the vision of oncoming motorists caused by the bridge elevation which blocked from view vehicles turning into the Mosca's crossover.
"Another cause of this accident was the State's failure to take any corrective action in closing this crossover when in 1986 the Modern Farms/Live Oak intersection was created.
"The State's failure to follow the standards in place in 1951 was also a cause of this accident. Had the State merely followed their standards at the five crossovers and provided median width of a minimum of 15 feet this accident more probably than not would not have occurred. Additionally, the DOTD was negligent in not requiring any changes to the length of the crossover when the Modern Farms/Live Oak intersection was constructed. If they had lengthened the crossover to what is required in the 1940 AASHO standards this accident more probably than not would not have happened."
Numerous documents in evidence and the testimony of Dufrene-called expert witnesses support the trial judge's findings that the DOTD breached its duty in 1951 when Highway 90's four-lane stage was completed and again in 1986 when the Modern Farms/ Live Oak intersection was formed. At both times, the DOTD could and should have required a safe left-turning layout on Highway 90 where it intersected with Live Oak. Prior to the 1951 major construction project, the state had available AASHO and its own standards, as well as several mandates from the legislature. The median constructed near Mosca's was only seven feet wide and was in violation of each and every standard regarding median width.
The same scenario was repeated in 1986 when the median's width was increased to only nine feet on one end and to 11 feet on the other end.
In addition to Dr. Dart and Colonel Andre, petitioners produced Robert Canfield, an expert in traffic safety, traffic engineering and highway design. Canfield said that when Jefferson Parish applied for a permit from the state to bring the Live Oak connection into the intersection, the DOTD should have required additional widening of the median in front of Mosca's because the DOTD was aware of the opening. According to Canfield, the DOTD had the option to (1) put a left turn lane in for west-bound traffic to make a U-turn, (2) close the opening or (3) widen the median. He called the left-turning setup at Mosca's a hazard to the public. He said that in 1945 AASHO standards called for at least a 15 foot wide median in a rural area.
In 1940, the American Association of State Highway Officials published "A Policy on Highway Types" in which it stated that median strips less that 19 feet in width are considered narrow because "ordinarily they do not afford complete protection to vehicles crossing the divided highway on to vehicles making left turns through short openings."
*1036 Gauthreaux, who retired in 1991, had been the DOTD's district traffic operations engineer. Highway 90 was within his jurisdiction.
Guy Leonard, a civil engineer who has worked for the DOTD since 1979, and who is currently a design engineer for the DOTD, testified that the DOTD established its own standards in 1955 and those standards called for a 30-foot minimum width for the median.
Several Louisiana state troopers investigated the accident, led by Robert Vittatoe. In his "Reasons for Judgement," the trial judge said this of Vittatoe:
"In the darkness of the night, Trooper Vittatoe could not determine what caused the Willingham vehicle to cross the median and strike the Dufrene van. As a follow up to his initial investigation, Trooper Vittatoe returned to the accident scene on Sunday following the Friday night accident and saw a tire track off of the north shoulder that began adjacent to the beginning of the Mosca's crossover and came back onto the shoulder which directly lined up with the imprints left in the median caused by the Willingham vehicle. Trooper Vittatoe also parked his unit in the Mosca's cutout as Borrello had described and walked back to the exit past the bridge to make a visual observation of a vehicle turning into the median. Trooper Vittatoe testified that the bridge preceding the Mosca's crossover blocked the ability of an individual to see a car in the Mosca's crossover until it was on top of or over the bridge, approximately 270 feet from the crossover.
"Trooper Vittatoe testified that, based upon the statements of Percle and Borrello, along with the evidence of the tire tracks, and his personal sight observation of the roadway, he believed that the cause of the Willingham truck suddenly swerving was to avoid colliding with the Borello vehicle that was sticking out and partially blocking the left travel lane while Mr. Borello was waiting to make his left hand turn across traffic."
Craig Percle was in his vehicle at the stop sign on Live Oak waiting to enter Highway 90. He saw Willingham's truck swerve to the right shoulder and then turn abruptly left. Percle said that the pickup truck went out of control when it went into the shoulder.
The trial judge found Willingham partially at fault because of his "in attention" and in failing to control his vehicle after he saw that the rear of Borrello's car was in his lane of travel. We cannot say that this finding was clearly wrong.
Having found the DOTD and Willingham at fault, the trial judge allocated percentages to each, 80 percent to the DOTD and 20 percent to Willingham. When a trial judge assigns percentages of fault under Louisiana's comparative fault system, an appellate court should not reapportion unless the trial court's percentages are manifestly erroneous. See Campbell v. Louisiana Dept. of Transp. and Development, 648 So.2d 898 (La.1995), and Hunter v. Department of Transp. and Development of State of La., supra. In both the Campbell and Hunter cases, the courts of appeal reversed district court percentages of fault only to have the Louisiana Supreme Court reinstate trial court findings.
In Brown v. Louisiana Indem. Co., 707 So.2d 1240 (La.1998), however, the Louisiana Supreme Court did reduce the DOTD's percentage of fault from 75 percent to 25 percent, the highest amount, according to the majority opinion, the trial judge could have reasonably allocated to the DOTD.
Regarding an appellate review of allocation of fault, we are guided by this language from Clement v. Frey, 666 So.2d 607 (La.1996):
"Just like in the quantum area, there is for sure a large amount of uncertainty in the allocation of fault. Our Coco (Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977)) decision pointed out that the ultimate determination by an appellate court as to whether a given judge or jury abused their `much discretion' as a matter of law is a judgment call."
Our judgment call here affirms the Dufrene trial judge's judgment call. Could have the DOTD been found less than 80 percent responsible? Yes. But considering trial court findings supported by expert (and other) testimony and pertinent documentary evidence cited by the trial judge, we are unable *1037 to say that 80 percent was manifestly erroneous.

ASSIGNMENT NO. 7
In this assignment of error, the DOTD says that the damage awards were grossly excessive; however, appellant neither specifies which elements are disproportionate to the injuries sustained nor does it cite any cases supportive of this contention.
Mrs. Dufrene was seriously hurt. She was airlifted by helicopter to West Jefferson Hospital where emergency surgery was performed. She sustained these injuries:
Fracture of proximal right humerus,
Compound open fracture left tibia and fibula,
Closed fracture mid shaft right femur,
Fractured right ribs,
Optic nerve injury of left eye,
Axillary nerve injury of the right shoulder,
Multiple lacerations of legs,
Nasal/orbital/ethmoid fractures with the entire lower portion of the nose separated from her face. Nasal bone, orbital bone, and ethmoid bones were pushed back into her skull,
Contusion right breast,
Right hemopneumothorax secondary to fractured right ribs,
Complex laceration through all layers of nose dividing seal luminously and both lateral cartilages at the dome area,
Complete laceration of the nasal mucosa bilaterally, and
Complex laceration of chin and left cheek.
On December 17, 1990, she was transferred from West Jefferson Hospital to Ochsner Foundation Hospital, where the fibia fracture was operated on with an open reduction internal fixation and rodding of the tibia took place.
Mrs. Dufrene lost much of her left eyelid. In January 1991, a portion of her right eyelid was grafted and sutured to her left eyelid.
Mrs. Dufrene was discharged following 46 days of hospital confinement. She remained in a full cast or a walking cast on her left leg through June 1991. In July 1991, Mrs. Dufrene was readmitted to Ochsner when doctors performed reconstructive surgery on her nose by removing a portion of a rib and attempted to rebuild her nose by wiring the grafted rib portion into the remaining bony portion of her nose.
In September 1991, she was readmitted into Ochsner for treatment of a ruptured left side disc which was surgically repaired on September 12, 1991. The ruptured disc and resulting surgery were causally related to the automobile accident.
Mrs. Dufrene has undergone numerous scar revisions and reconstructive lid surgeries since this accident and still suffers from a traumatic cataract. Her facial structure was severely disfigured and scarred.
At this present time, Mrs. Dufrene suffers nerve damage to the axillary nerve of her right shoulder which causes severe loss of range of motion to her right shoulder and atrophy of the right deltoid muscle. She suffers from numbness over the left side of her face and forehead and she also suffers from low back pain and pain in her left leg. Additionally, Mrs. Dufrene will require surgery for removal of the rods in her femur and tibia. Based on an examination of Mrs. Dufrene in July, 1997, a 38% whole body disability rating was assigned by a board certified orthopedist, Lawrence Russo, M.D.
Mrs. Dufrene's recovery has been painful and is ongoing. Her children have suffered emotionally both from the loss of their father and from being shut out of their mother's life due to her massive injuries.
The awards made in this case were substantial but justified. They are affirmed.

OCHSNER'S INTERVENTION
Mrs. Dufrene was a member of the Ochsner Health Plan, which paid medical expenses of $127,893.67. The trial judge ruled that Ochsner Health Plan was not entitled to recover these expenses "until it is shown that Yvonne Dufrene has received full compensation from both the DOTD and John Willingham." Further, the trial judge stated, that "should OHP be entitled to a subrogation claim, the subrogation claim will be in *1038 the amount of $127,893.67 less a Moody[2] calculation to be determined at a later date."
On appeal, Ochsner Health Plan does not address whether its claim may be subject to a Moody deduction, anticipating that this issue will be determined at a later hearing.
According to the subrogation contract, Mrs. Dufrene agreed to reimburse Ochsner Health Plan for "any and all amounts" recovered by her. This language is clear. Accordingly, Ochsner Health Plan is entitled to $127,893.67, less a Moody calculation. We remand for such a hearing.
AFFIRMED IN PART, REMANDED FOR HEARING.
NOTES
[1] Borrello was named a defendant in the original petition but he was dismissed when the trial judge granted his motion for summary judgment. See 656 So.2d 1063 (La.App. 5 Cir.1995).
[2] See Barreca v. Cobb, 668 So.2d 1129 (La.1996)