732 So.2d 1277 (1999)
Sharon Lederer, Wife of/and Ronald LEDERER
v.
FAMOUS ENTERTAINMENT, INC. and First Financial Insurance Company.
No. 98-CA-2274.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1999.
*1278 Morton H. Katz, Richard E. King, Herman, Herman, Katz & Cotlar, New Orleans, LA, Counsel for Plaintiffs.
Al M. Thompson, Jr., Berrigan, Litchfield, Schonekas & Mann, New Orleans, LA, Counsel for Defendants.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge DENNIS R. BAGNERIS Sr.
WALTZER, Judge.

STATEMENT OF THE CASE
Ronald Lederer and his wife, Sharon, sued Famous Entertainment, Inc. (FEI), owner and operator of the Famous Door bar located at 339 Bourbon Street, the estate and heirs of Nick Karno, owner of the property at which the bar was located, and First Financial Insurance Company, (First Financial), insurer of both Karno and FEI. Plaintiffs claimed damages for injuries allegedly sustained by Lederer when he fell while participating in a "conga line" dance at the direction of an FEI employee, and for Mrs. Lederer's loss of consortium.
The case was tried to a jury, which found in response to special interrogatories that FEI was negligent, that this negligence was a cause in fact of Lederer's injuries and that Lederer was responsible for the accident to the extent of 45%. The jury awarded $100,000 for past, present and future physical pain and suffering and loss of enjoyment of life; $200,000 for permanent disability; $200,000 for loss of earnings and earning capacity, and $50,000 for medical bills. The jury awarded Mrs. Lederer $50,000 for loss of consortium and society.
The trial judge entered judgment on the verdict on 5 February 1998, awarding Mr. Lederer $302,500 and Mrs. Lederer $27,500, plus legal interest from judicial demand.
FEI and First Financial moved for a new trial and for judgment notwithstanding the verdict. The trial court denied the motions on 24 March 1998. FEI and First Financial appeal from that judgment. The Lederers answered the appeal, claiming Mr. Lederer's award of $100,000 for general damages is manifestly insufficient.

STATEMENT OF FACTS
Vernon Wehner testified that he and his wife were owners of FEI's holding company and that FEI purchased the Famous *1279 Door business from Louis Karno about ten months prior to Mr. Lederer's accident. At the time of the accident, the Wehners were actively engaged in the management of the Famous Door, and employed Herbie Johnson as emcee and Charles Travis as doorman. Mr. Wehner testified that he was aware of conga line dancing in the bar and of the fact that, on occasion, the conga dancers would go outdoors with the encouragement of the emcee.
Mr. Wehner described the entry to the bar as raised and at an angle to the corner of Bourbon and Conti Streets. According to Mr. Wehner, Vieux Carre regulations did not permit him to modify the entrance. Mr. Wehner testified that it was Travis' duty to look out and warn people at the entry, whatever activity was going on at the time, because of the unusual nature of the step. However, he was not absolutely positive that his doormen always did so.
The bar does not charge for the music and entertainment provided, but exacts a one drink per hour minimum from its customers.
Johnson was not employed by FEI at the time of trial and testified by deposition. He had worked at three Karno clubs for ten years, including three years as a doorman and two years as emcee at the Famous Door. According to Johnson, the doormen at the Famous Door functioned as a salesman, encouraging pedestrians to enter the bar, and as security.
Johnson testified that when the bar's disc jockey played Latin music, it was his custom at the time of the accident to put a sombrero on a customer's head and ask him to lead the conga line. He testified that he did not direct the conga leader to go outside the bar, but that if the leader chose to go out the door, it was the doorman's duty to tell the customers to watch their steps. He had never seen anyone in a conga line fall when exiting the bar. He testified that taking the conga line out into Bourbon Street stimulated business. Although he was never told to discontinue the conga lines, he testified he no longer initiated conga dancing at the bars where he worked. Johnson denied having witnessed Mr. Lederer's accident.
Charles Travis testified that he was the barker on the door of the Famous Door at the time of Mr. Lederer's accident. He described his job as "building a room," that is, getting patrons into the bar to buy predominantly the drinks, and also the teeshirts, hats, candy, peanuts, raincoats and condoms, sold in the bar. He testified that the drink minimum is not strictly enforced, because the bar's goal is to create a jovial atmosphere that will attract more and more patrons. He testified that it was not unusual for the Famous Door's emcee to start a conga line. Mr. Travis did not witness Johnson start the conga line on the night of Mr. Lederer's accident.
Mr. Travis testified that at times conga lines go outside the bar to help build the room and to encourage the patrons to have a good time. As a barker or doorman, Mr. Travis would warn a patron to watch his step when leaving the bar only if the patron looked drunk or unable to handle himself. He testified that, for the most part, he would lay back and let the patrons have fun. He did not recall having issued any warning the night of Mr. Lederer's accident. According to Mr. Travis' recollection, Mr. Lederer started losing his balance a step or so outside the door. In his deposition, taken about a year prior to trial, Mr. Travis testified that Mr. Lederer was in the process of falling as he was stepping off the platform in the doorway but could not recall if he was already falling or lost his footing at that point.
Mr. Lederer testified that he is a certified automobile auctioneer and vehicle verifier in California, employed by Black and White Garage, Inc., an official police garage. Prior to the accident, it was his job to examine cars towed to one of Black and White's three lots, physically find the cars, verify the license and identification numbers and place a value on each vehicle for lien sale purposes. One of the lots, for low *1280 value vehicles, was not paved. Mr. Lederer spent most of each day on his feet, moving among the two to three acres covered by the Black and White lots. From the mid-1970s to the mid-1980s, Mr. Lederer also ran a wrecking yard for Black and White, where he answered the phone and checked for car parts on a three and one-half acre lot.
He testified that he had polio when he was thirteen years old leaving him with weakness in one arm, in his back, in his stomach muscles, in his legs and in his lungs. Since his work for Black and White did not require any real physical strength or heavy lifting, his polio did not affect his job performance.
He testified that prior to the accident he was able to climb to the roof of his two-story house to perform routine maintenance and enjoyed cleaning and waxing classic cars as a hobby.
On the day of the accident, Mr. Lederer was fifty-four years old. He and his wife took a plantation tour and walked down to the river, visited Jackson Square and browsed shops in the Vieux Carre. They returned to their rooms in the Royal Sonesta Hotel at approximately 4:00 in the afternoon. They had dinner at K-Paul's restaurant at 6:00, where, he testified, he might have had a glass of wine, and decided to walk up and down Bourbon Street. He drank a screwdriver at a jazz club and split a Hurricane with his wife at Pat O'Brien's bar. The Lederers and a companion couple shopped for T-shirts and a tie and, about midnight, approached the Famous Door, where they heard music of the 1950s and 1960s. He did not notice if there was a barker at the door. The Lederers and their companions entered the bar, and he ordered another screwdriver. The group listened to between six and eight songs, and he ordered another screwdriver. When the conga line started, he looked at his group and said, "Let's jump in." He did not hear anyone say to take the conga line outside, but he noticed the front of the line starting out of the front door. He did not notice a Famous Door employee at the door, and testified there was no handrail at the entrance. No one told him to look down or to watch his step. He looked down as he crossed the threshold, and felt the girl in front of him pull out of his hands as she stepped down. His next step was in error, and he found nothing under his right foot, whereupon he fell a bit forward and, with his leg in a vertical position and his foot behind him, he fell down on one knee. He testified that he had not paid attention to the entry and did not notice the step down where he fell. An ambulance came immediately and took him to the Tulane Medical Center, where an x-ray of his leg confirmed a shattered femur. The Tulane doctor, orthopedic surgeon Dr. Ollie Edmunds, wanted to operate immediately the next morning. Dr. Edmunds testified that Mr. Lederer was in severe pain when he saw him at 1:00 a.m. following the accident. Dr. Edmunds found Mr. Lederer was not obviously intoxicated, and gave a clear account of the accident and of his medical history. The history included the fact that Mr. Lederer was diabetic and had glaucoma, as well as childhood polio.
Mr. Lederer's HMO, Kaiser, decided his injury was not life threatening and, after one and a half days of haggling with the Tulane doctors, ultimately required Mr. Lederer either to return to California for his surgery or to advance the $20,000 to $25,000 cost of the surgery himself, subject to Kaiser's later review for possible reimbursement. Dr. Edmunds described the Kaiser procedure as outrageously brutal and inhumane. Mr. Lederer was unable to pay for the surgery in cash and, with great difficulty, flew back to California for surgery. He described his ordeal, which involved unstabilized transport to and from the airports, being placed in a blanket and passed hand-to-hand over the airplane seats to his assigned seats, with his shattered leg at a 45 degree angle, and a flight of over five hours from New Orleans. Because he was unable to go to the bathroom, *1281 he did not want to drink any liquids and was thus unable to take oral pain medication. Upon his arrival in California, he was taken to the Kaiser Foundation Hospital, the choice of his HMO, by ambulance, where his orthopedist, Dr. Kevin Moore, looked at the x-rays and determined to perform surgery the next day.
Mr. Lederer was placed under general anesthetic and a plate was inserted from just above the knee cap and up his femur. After the surgery, he could see the scarring and the metal rod in his leg. He spent ten days in the hospital, whereupon he returned home. His leg could not bear weight from June to October. By November, he returned to work using a wheelchair and a walker. A month later, the union of the femur bone failed, requiring additional, more extensive surgery. Dr. Edmunds testified that this is a complication typical of Mr. Lederer's original injury. According to his reading of the xrays, Mr. Lederer had not suffered any weakening of the femur as a result of his childhood polio.
In the second surgery, the doctors replaced the metal plate, sliced into Mr. Lederer's hip, took out a chunk of bone, ground it into paste and put the paste around the break in the femur. They also added femur bone from a cadaver and bolted the entire process together. Mr. Lederer continued rehabilitation as after the first surgery, and wore a low-dose electrical battery pack twenty four hours a day to help heal the bone. He was next able to bear weight in April, about ten months after the original injury.
Dr. Edmunds testified that Mr. Lederer's inability to put weight on his leg for most of the ten month period could cause dis-use osteoporosis softening of the bones and atrophy of the thigh muscle. When shown a photograph of the present condition of Mr. Lederer's thigh, he reflected that at the time of the accident, Mr. Lederer's thighs were the same size, but at the time of trial the right thigh demonstrated dis-use atrophy. Dr. Edmunds opined that arthritis of the knee can also become a problem with this type of injury.
Dr. Kevin Lawrence Moore, an orthopedic surgeon practicing at Kaiser Foundation Hospital and associated with the Kaiser Permanente medical group in Woodland Hills, California, testified by deposition. He admitted Mr. Lederer from the Kaiser emergency room on 12 June 1993. Mr. Lederer was in a range of motion brace; his knee, thigh and calf were wrapped in a bulky dressing and the brace was placed over this. Dr. Moore repeated the x-rays taken at Tulane and diagnosed a comminuted supracondylar, intercondylar femur fracture where the end of the bone had been shattered in many pieces. The fracture extended into the joint between two condyles and proceeded up in many pieces; the central piece of the femur was split. The bone had actually telescoped into itself causing some shortening of the fracture. Mr. Lederer accepted Dr. Moore's suggestion to treat the fracture surgically.
Dr. Moore described the surgical procedure. After the incision was made, the doctor placed two screws across the condyles of the joint to be sure the pieces would be congruous. A large blade plate was assembled and put along the edge of the outside aspect of Mr. Lederer's thigh bone. The piece of bone was skewered, a procedure in which the doctor first drove an introducing hole into the bone and affixed the major pieces of bone to the plate. Many small pieces of shattered bone were left alone and could not be integrated into the repair. The blade was then screwed into place. Dr. Moore felt the surgery was successful, and the surgical team had reassembled the joint nicely.
Dr. Moore prescribed antibiotics for Mr. Lederer, infused him with two units of blood and started him on a continuous motion machine, which moved his knee back and forth to maintain mobility in his knee. Mr. Lederer was released from the hospital a week later and was not allowed *1282 to bear weight on his affected leg for four months. Dr. Moore prescribed pain medication for Mr. Lederer, describing the operation as quite painful. Mr. Lederer was unable to shower for two weeks and was required to use the continuous motion machine which flexed his knee continually. Dr. Moore described the incision as starting at the knee and proceeding to midthigh.
Dr. Moore saw Mr. Lederer following the first surgery for four months. Mr. Lederer showed steady progress and was confined primarily to a wheelchair. Dr. Moore allowed Mr. Lederer to begin weight bearing in November, and a month later, Mr. Lederer slipped down his stairs and the plate in his leg broke through at a screw hole. Such non-union is an expected complication of this surgery, occurring in 15 to 20 percent of cases. A few days after the failure of the first union, Dr. Moore performed a second surgery, similar to the first. He put in a new blade plate and added for support an allograft of cadaver bone on the inside aspect of Mr. Lederer's knee, and performed a bone graft from his hip in an attempt to encourage healing of the bone. The second plate was two holes longer than that used in the first surgery. Mr. Lederer had a similar recovery and rehabilitation treatment from the second surgery. In all, Mr. Lederer could not bear weight from June until November and again from January until mid-April. Dr. Moore opined that Mr. Lederer lost range of knee motion: normal knee motion is 140 degrees, and Mr. Lederer had only 85 degrees of motion. Dr. Moore did not expect this range of motion to improve over time. He also testified that Mr. Lederer was left with some mild varus deformity, or bowing of the leg, which puts additional stress on the femur.
The incision for the second surgery went further, from six inches below the knee to mid-femur level, because of scar tissue from the first surgery. Dr. Moore testified that Mr. Lederer will continue to need some type of support, either a cane, crutch or walker. He described Mr. Lederer's limitations, including difficulty in negotiating stairs, a leg length discrepancy of one and one-half inches and difficulty walking long distances. He believed Mr. Lederer could return to his job, but would be slower than prior to the accident.
Dr. Moore related both surgeries to Mr. Lederer's accident while vacationing in New Orleans. He did not anticipate the need for future surgery.
Dr. Joni Jordan, Mr. Lederer's primary care physician at Kaiser, confirmed that Mr. Lederer needed no assistance in walking prior to the accident. She testified to some leg atrophy as a result of his childhood polio. She was not involved in caring for his fracture and the aftermath of the two surgeries.
Dr. Mitchell Martin Danish, a Kaiser neurologist, testified by deposition. Dr. Scott Weingarten referred Mr. Lederer to Dr. Danish in June, 1990 for diagnosis of new weakness in Mr. Lederer's shoulders and/or hips. Mr. Lederer complained of increased weakness of the left shoulder, right triceps muscles, pectoral muscles, stomach muscles and right hip flexors, and increased leg weakness. He examined Mr. Lederer and found atrophy of both quadriceps and hamstrings. Muscle strength in the thigh was below normal. Dr. Danish opined that Mr. Lederer had changes consistent with a very slow progressive nature over an eight to ten month period most likely representing post polio syndrome. He prescribed and Mr. Lederer engaged in a program of physical therapy. Dr. Danish saw Mr. Lederer again in February, 1991, and found he was stable, with no measurable change. In October, 1991, he referred Mr. Lederer to a post-polio specialist, as a result of which Mr. Lederer attended classes relating to this disability. Dr. Danish saw Mr. Lederer for the last time in April, 1992, and noted he was attending post-polio classes and was less tired at the end of the day. Dr. Danish opined that over his lifetime, Mr. Lederer had become able to compensate for his *1283 childhood polio and its aftermath. The post polio syndrome accounted for a loss of strength in Mr. Lederer's thighs from normal (5) to moderately/severely weak (2).
Neurosurgeon Dr. Richard Warren Levy testified by deposition as an expert in neurosurgery. He had examined Mr. Lederer's medical records, but never saw him personally. He described post polio syndrome as slowly progressive and not continuously progressive. It may occur and progress slowly for a matter of months or a year or two and then reach a plateau and stop temporarily. Dr. Levy opined that weak quadriceps muscle causes the knee to be unable to lock completely, and if the knee doesn't lock, then the individual may well fall, with great frequency. In addition, if the nerve supply to the quadriceps muscle is not working normally, then the muscle gives way and the individual may fall. He noted from Dr. Danish's record that Mr. Lederer had no knee reflex as of October, 1990, prior to the accident. This he attributed to his polio.
Mrs. Lederer testified concerning her husband's recuperation and rehabilitation. Initially, he was confined to the downstairs living room, where she fed him, and the kitchen, where she bathed him. She also oversaw the use of the continuous motion machine. During the first few weeks he was confined to his bed and used a rented port-a-toilet and urinals which Mrs. Lederer kept clean. She fed him breakfast and bathed him, got him back into bed and set up the flex machine prior to going to her secretarial job. After a week, the doctor advised her not to leave Mr. Lederer on the flex machine for the entire nine hours she was at work, so she had to cut back to five hours. Eventually, she lost her job because her employer needed a full-time secretary. Throughout the ten or eleven months of recuperation, she had to bath Mr. Lederer and wash his hair. When he was able to return to work, she drove him and handled the logistics of his wheelchair.
Mr. Lederer did not suffer any salary loss; his employer made up the difference between his payments from Key Man insurance and state disability and his salary. He returned to his job in April, 1994, and was able to do everything he had done before at the main lot. The injury did not affect his auctioneer function. He is able to perform sixty to seventy percent of the inspections he did previously, and the balance is performed by an employee transferred from another department. Mr. Lederer's longstanding plan to retire at age 65 was not affected by his injury.
Mr. Lederer testified that he had had two back surgeries prior to the accident, and that both had resolved favorably. In 1990, he was diagnosed with some symptoms of post polio syndrome which caused fatigue in his shoulders and chest and some chest pain. Despite his polio, Mr. Lederer had been able to enjoy travel to Alaska which included a cruise and a journey to Denali Park, involving a great deal of walking, and a tour of Canada and New England which also was physically demanding.
He claimed residual atrophy of his right leg caused by the ten months of inactivity resulting from the two leg surgeries related to his injury. Mr. Lederer also wears a lift in his right shoe because the broken leg ended up an inch and a half shorter because of withdrawal of his ligaments. He is unable to bend his leg back past 90 degrees. Mr. Lederer testified that he can no longer attend car shows or participate in drag racing as before his accident.
Mr. Lederer testified to a total hospital bill of $46,134.15 for treatment at Tulane and for the Kaiser surgery.
Mr. Lederer's account of the accident and its immediate aftermath was corroborated by his companion, Richard A. Hinton, who testified by deposition. Mr. Hinton testified that he met Mr. Lederer through a Corvette car club, and over the six years of their acquaintance had made many trips with him. According to Mr. Hinton, Mr. Lederer had been able to *1284 travel to car shows and participate actively despite his childhood polio.
Anthony Torres, Jr., owner and chief executive of Black and White, testified by videotaped deposition. He testified that he met Mr. Lederer in 1960, and Lederer began working for Black and White part-time in 1963. Mr. Lederer was laid off in 1969 or 1970 and worked for another official police garage. In 1972, Torres gained a controlling interest in Black and White and hired Mr. Lederer as his general manager, assisting with employees, scheduling, inspecting and disposing of vehicles at auction. Mr. Lederer verified vehicle identification and checked under the hoods of the cars, and was on his feet most of the day. Mr. Torres described Mr. Lederer as a good worker and a good friend. Although Mr. Lederer had had polio as a child, he was able to do his work on a regular basis.
Mr. Torres testified that he was aware of Mr. Lederer's accident and that he paid Mr. Lederer the difference between his salary and his disability payments. After his return to work, Mr. Lederer used first a wheelchair and a walker and later a walker. This has restricted his ability to work in Black and White's secondary, gravel lot, where Mr. Torres has now transferred a helper to assist Mr. Lederer. Mr. Lederer also has to take breaks more frequently than before the accident. Mr. Torres testified that Mr. Lederer's disability has not affected his salary in any way. Mr. Torres testified from Mr. Lederer's W-2 forms that his earnings were: $64,320 in 1989; $72,712 in 1990; $77,301 in 1991; $84,850 in 1992; $75,009.34 in 1993.

FIRST ASSIGNMENT OF ERROR: The jury erred in awarding $200,000 in damages for lost earning capacity in the absence of evidence that any occupation and wages were not available to plaintiff because of injuries related to his injury.
The plaintiff presented no lay or expert testimony tending to establish that Mr. Lederer was unable to perform any occupation for which he was otherwise qualified prior to the accident. Likewise, there was no actuarial evidence of Mr. Lederer's work life expectance.
The authorities cited by the Lederers define this state's manifest error standard correctly. Appellate courts may not set aside a jury's finding of fact unless it is clearly wrong. We defer to the jury's reasonable evaluations of credibility and reasonable inferences of fact where there is a conflict in testimony. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612, 614. Furthermore, the jury's choice between two permissible views of the evidence cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). However, we do not find evidentiary support in the record for the jury's award of damages for lost earning capacity. Simply stated, there was no evidence of such loss for the jury to evaluate; no witness testified to such loss to form the basis for the jury's credibility choice. Mr. Lederer himself testified that he suffered no past lost wages, and that his employer made him whole for the time he missed. The employer corroborated this testimony. The reasonable accommodations made by the employer on Mr. Lederer's behalf are consistent with the principles underlying the federal Americans with Disabilities Act. There is no suggestion in the record that, with these accommodations in place, Mr. Lederer will not be able to work until his chosen retirement age of 65 years.
We are instructed that before a factfinder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our *1285 constitutional duty to review facts[1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
Unlike the cases cited by the Lederers, in the instant case the jury was not presented evidence of what Mr. Lederer could have earned prior to the accident, save proof of what he actually earned in the job he retained and still retains after the accident. There is likewise no evidence that any job for which he was qualified prior to the accident is no longer available to him by reason of his injury. Neither is there evidence of work life expectancy.
The Lederers contend that FEI waived its objection to this element of damages by its failure to object to the trial court's instructions to the jury. However, we find the jury instruction on damages to be unobjectionable. The instruction included the following admonitions:
[Y]ou should not conclude that because I am going to speak to you about damages that I believe that the plaintiff should recover.
The court then instructed the jury on the criteria for an award of damages for lost earning capacity:
You are to consider the plaintiff's physical condition prior to the incident, the plaintiff's work record, the amount of the plaintiff's earnings in the previous years, the probability or the improbability that plaintiff would have earned similar amounts during the remainder of the plaintiff's worklife if the plaintiff had not sustained the injury for which he filed this lawsuit. You should also consider the motivation of the plaintiff to return to work, the decreasing purchasing power of the dollar and you should consider the plaintiff's gross wages.
The plaintiff must prove both general and special damages by a preponderance of the evidence. And by this I mean that after consideration of all the evidence that you, as jurors, find that the existence of a fact is more probable than its non-existence. However, again you should keep in mind that speculation, guessing and a mere possibility is not sufficient to establish the existence of a fact.
Special Interrogatory # 5 to the jury asks the jury to quantify as an element of damages "loss of earnings and earning capacity."
The transcript of the proceedings following the close of testimony and outside the presence of the jury contains no objection by FEI to the instruction or to Special Interrogatory # 5. While the jurisprudence supports the Lederers's contention that FEI waived its objection to the instruction and to the interrogatory, such waiver does not supply evidence of lost earning or earning capacity such as would support the jury's award under the manifest error standard. While FEI's failure to object in a timely manner precludes their demanding a de novo review of the evidence based on an erroneous jury instruction/interrogatory, this Court remains bound to examine the entire verdict on the basis of manifest error.
During oral argument, counsel for Mr. Lederer suggested that a portion of the $200,000 jury award compensated plaintiff for the disability payments he received, a "collateral source" which, if proven, would justify an award in the amount of the disability payments received. In brief, counsel for plaintiff refers to "a past lost wage of a minimum of $40,000, and as much as $65,000." However, these figures seem to be somehow extrapolated generally from Mr. Lederer's salary for prior *1286 years by application of a factor of 10 months of post-surgical rehabilitation. We do not find in the record testimony or documentary evidence showing the amount, if any, of these disability payments.
Mr. Torres testified that he paid him the difference between what he was getting for disability and what he had been receiving, and described the disability as "the state disability it's something that is deducted from and I think the corporation match, it's a workmen's comp type of thing." Mr. Torres did not testify to the amount of these state disability benefits.
Mr. Lederer was no more specific in his testimony. He testified:
Tony had insurance on me what they call Key Man Policy which the company pays for. If you are injured after 30 days there is a 30 day waiting period then this insurance company picks up your wage a certain percent. California has a state disability law so I filed for state disability and with this Key Man Policy which the shop had pretty came very close to making up my complete wages. It was a little difference and Tony made up the difference.
He testified that he returned to full time employment in April, 1994, ten months after the accident.
The 1993 federal tax return in evidence for the year during which the injury occurred shows in attachment W-2 total wages of $75,009.34. The corresponding amount in 1988 was $53,700; the total for 1989 was $64,320; the total for 1990 was $72,712; the total for 1991 was $77,301; the total for 1992 was $84,850.
We cannot determine from the evidence of record the amount of benefits, if any, allegedly received by Mr. Lederer from a collateral source, that is, disability payments under the employer's Key Man policy (which is not in evidence) or under the California compensation system (whose benefit schedule is not in evidence).
Under these circumstances, we find that the verdict is without evidentiary support and it is our constitutional duty to reverse this portion of the jury's award. In the total absence of evidence of loss of earning capacity or lost earnings, the jury was manifestly in error when it awarded $200,000 to Mr. Lederer for this item of damage.

SECOND ASSIGNMENT OF ERROR: The jury erred in finding defendant liable where the evidence showed that plaintiff voluntarily participated in a conga line dance which he knew would traverse possibly uneven elevations.
While there was evidence that Mr. Lederer voluntarily participated in the conga line, it is clear that the jury considered that evidence when it cast him for 45% of the causative fault of the accident. This apportionment of fault is subject to the same manifest error analysis as that applied to a jury's finding of general damages, and will not be set aside absent abuse of the trier of fact's great, even vast discretion. The Louisiana Supreme Court adopted the manifest error standard regarding the allocation of fault. While recognizing that, as in the quantum area, there is great uncertainty in the allocation of fault, the court adopted the rule in Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976) which pointed out that the ultimate determination by an appellate court as to whether a given judge or jury abused their `much discretion' as a matter of law is a judgment call. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, 609.
The Court in Coco held that only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide *1287 what it considers an appropriate award on the basis of the evidence. Id. The supreme court in Clement recognized the analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both Coco and Clement, the trier of fact, unlike the appellate court has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. Accordingly, the Coco standard is to be used reallocating fault. After the court of appeal finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's decision. Id.
We agree with FEI's contention that Louisiana law does not make a bar owner the insurer of its patrons' safety, nor does it impose a legal duty to protect all persons from all risks. Pratt v. Lifemark Corp., 531 So.2d 488 (La.App. 4 Cir. 1988), writ denied 536 So.2d 1214 (La. 1989). We note that the jury was properly instructed on the liability issue. In assessing 45% of the fault to Mr. Lederer, the jury demonstrated that it applied correctly the principle that a person must exercise reasonable care for his own safety by seeing what he should see and refraining from engaging in conduct that is dangerous under the circumstances. The evidence clearly shows that the conga line was formed at the instigation of FEI's employees for the entertainment of the patrons and in order to encourage patronage from persons on Bourbon and Conti Streets. The nature of the line placed an obstruction to Mr. Lederer's view of the step, in the form of the lady dancing immediately in front of him.
The record below convinces us that the jury was not clearly wrong in apportioning 55% of the fault for the accident to FEI. There was credible evidence that its employee Johnson encouraged the guests, who he knew or should have known had been drinking alcoholic beverages, to "conga" out the exterior door, whose configuration presented a hazard. FEI employee Travis admitted that although he was on duty as a barker at the door, he did not warn the dancing patrons to look down or to watch their steps.
We conclude that there is a reasonable basis for the jury's allocation of fault and that the allocation was not manifestly erroneous.

THIRD ASSIGNMENT OF ERROR: The jury erred in awarding $50,000 for past medical expenses where the medical bills submitted totaled only $46,134.15.
While the Tulane and Kaiser medical bills totaled only $46,134.15, there was evidence that Mr. Lederer rented or purchased various sickroom supplies, including a porta-toilet, urinals and a walker. There is also evidence of record that he was prescribed pain relievers. The jury was not manifestly or clearly wrong in awarding approximately $3800 to cover the various incidental medically related expenses sustained by Mr. and Mrs. Lederer as a result of the accident.

PLAINTIFF'S ANSWER TO APPEAL: The jury award of $100,000 for past, present and future physical pain and suffering and loss of enjoyment of life is manifestly insufficient.
Our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the jury's much discretion. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). The discretion vested in the jury in this case is "great" and even vast, so that we should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the *1288 award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
We have carefully considered the entire record concerning Mr. Lederer's pain and suffering. In light of his painful experience at Tulane, the awkward and painful plane trip in an unstabilized condition to the Kaiser hospital in California, his two surgeries, the failure of the first result in another bone-shattering experience, his long recuperation and rehabilitation, his inability to take care of his personal hygiene needs while unable to climb the stairs at his home, the requirements of the continuous movement knee reflex machine and his continuing disabilities, we find the jury award of $100,000 in general damages to be so little as to shock the conscience. See Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991). We conclude therefore that the jury abused its great and vast discretion in making this award. We conclude from the entirety of the evidence viewed in the light most favorable to FEI, that a rational trier of fact could not have fixed the award of general damages at the level set by this jury and that this is one of those exceptional cases where the award is contrary to right reason. See Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987); Youn, supra, 623 So.2d at 1261.
Having found this abuse of discretion, we are called upon the analyze awards in similar cases to determine the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., supra; Youn, supra.
Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3 Cir.), writ denied 565 So.2d 450 (La.1990) while nearly ten years old, provides facts closely similar to those of the instant case. A jury awarded general damages of $250,000 to plaintiff, who suffered a compound fracture of his left femur, lacerations on both knees and a contusion to his right leg. Initially, plaintiff underwent three procedures, including placement of a pin in his left tibia. His right leg was placed in a continuous passive motion machine. A second surgery was performed to remove the pin. This surgery was not occasioned by a re-breaking of the bone upon failure of the union; however, the union was found to be insufficient and a metal rod was inserted and subsequently removed after the femur healed properly. His residual disability was similar to Mr. Lederer's, and he additionally faced surgery to remove a disc. The court found the jury's $250,000 general damage award to have been too low.
In 1994, the second circuit affirmed an award of $300,000 to a plaintiff who received a fracture of the right wrist resulting in a 30% disability, a drooping of her eyelid and a broken left leg just below the knee. She required only one surgery for the wrist and for insertion of pins, plates and screws in her leg. The union did not fail, so no remedial surgery was required. Stephens v. Town of Jonesboro, 25,715 (La.App. 2 Cir. 8/19/94), 642 So.2d 274, writs denied 94-2351, 94-2557 and 94-2577 (La.11/29/94), 646 So.2d 400.
In Lennix v. Labee, 94-748 (La.App. 5 Cir. 2/15/95), 652 So.2d 50, writ denied 95-0678 (La.4/28/95), 653 So.2d 594, the court affirmed a $250,000 general damage award for a shattered femur where there were no issues of non-union or remedial surgery. The Fifth Circuit affirmed a $375,000 general damage award for a gunshot-shattered femur with similar residual and the possibility of remedial surgery to alleviate pain and deformity and to replace a vein compromised in the surgery. Romaguera v. Piccadilly Cafeterias, Inc., 94-374 (La. App. 5 Cir. 12/14/94), 648 So.2d 1000 writs denied 95-0093 and 95-0124 (La.3/10/95), 650 So.2d 1183-84.
More recently, this Court raised a $200,000 jury general damage award to $300,000 where the plaintiff suffered a compound fracture of his right femur and a crushing injury to his left thigh, and endured six surgeries (four to drain fluid, *1289 clean the wound and implant a skin graft). He was incapacitated for about seven months. Hoskin v. Plaquemines Parish Government, 97-0061 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, writs denied 98-0270 and 98-0271 (La.4/3/98), 717 So.2d 1129.
While every personal injury case requires assessment of a dollar value to the effect of a particular injury to a particular plaintiff, the foregoing opinions offer some general guidance. In light of the pain, suffering and loss of enjoyment of life outlined in our review of the testimony, we find that $300,000 is the lowest amount which a reasonable trier of fact could assess for the effects of Mr. Lederer's injury.

CONCLUSION AND DECREE
For the foregoing reasons, we amend the trial court's judgment to delete for lack of any supporting evidence the award of $200,000 for lost earning capacity; to award general damages of $300,000 for Mr. Lederer's past, present and future pain, suffering and loss of enjoyment of life; we affirm the trial court's judgment as amended.

AMENDED IN PART; AFFIRMED AS AMENDED.
MURRAY, J., concurs with reasons.
MURRAY, J., concurring with reasons:
Contrary to the majority's conclusion, at page 14, that Mr. Lederer failed to prove any loss of earning capacity, I find the evidence of this loss to be undisputed. Prior to this accident, his job required a great deal of walking over varied surfaces at three different vehicle impound lots of different sizes, ranging from a capacity of 150 cars on the smallest lot to about 400 cars on the largest lot. Mr. Lederer said he would generally spend three to three-and-a-half hours each morning and each afternoon walking, unassisted, to accomplish the vehicle inspections that are essential to his job function. However, as a result of this injury to his leg, Mr. Lederer cannot walk without the aid of at least a wheeled walker, and sometimes a wheelchair. His condition is permanent, and even with the modifications made by his employer and the hiring of another individual to perform some of his tasks,[1] he works more slowly and laboriously to get his job done.
An award for loss of earning capacity requires only the presentation of "medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident" at issue. Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991). This medical evidence may be corroborated and complemented by lay testimony, including that of the plaintiff. Bize v. Boyer, 408 So.2d 1309, 1312 (La.1982); McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir.1993). A plaintiff may recover damages for loss of earning capacity, even though he may never have decided to take advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). Because compensation is due for the loss of ability to earn as well as any actual lost earnings, such damages are not calculated solely by a comparison of earnings before and after the injury. Id. at 1123-24. Instead, a plaintiff is entitled to compensation for any impairment of the capacity to earn established by the evidence presented, even if his actual earnings have increased. Hobgood v. Aucoin, 574 So.2d 344 (La.1990); Konneker v. Sewerage & Water Bd., 96-2197, p. 20 (La.App. 4th Cir.11/19/97), 703 So.2d 1341, 1351, writ denied, 97-3137 (La.2/13/98), 709 So.2d 760. Even an individual who was unemployed at the time of an accident is entitled to be compensated for any proven loss of *1290 earning capacity. Folse, 371 So.2d at 1123.
In this case, the uncontradicted evidence demonstrates that a fifty-four-year-old man who had been able to walk unassisted has been permanently deprived of that ability. On this evidence, the jury reasonably could conclude that even though Mr. Lederer has not yet sustained a direct economic loss, he has nevertheless suffered a loss of ability to compete in the job market, and is thus entitled to be compensated for that loss. Therefore, I find ample evidentiary support for the jury's determination that he was entitled to an award of damages for some loss of earning capacity.
Nevertheless, I am compelled to concur in the majority's deletion of the $200,000 awarded for "[l]oss of earnings and earning capacity" as unsupported by the record. Because of his employer's benevolence, Mr. Lederer demonstrated no actual "loss of earnings," and as the majority notes, there was no evidence by which the jury could have quantified the proven "loss of earning capacity." Although the amount of such an award "is inherently speculative and is not susceptible of calculation to a mathematical certainty," the record must contain evidence that reasonably supports a means of quantifying the value of the loss. Reichert v. Bertucci, 96-1213, pp. 8-9 (La.App. 4th Cir.12/4/96), 684 So.2d 1041, 1046, writ denied, 97-0023 (La.2/7/97), 688 So.2d 511 (citation omitted).
The type of evidence necessary to estimate a loss of earning capacity will depend upon the particular circumstances of each case; although detailed vocational evidence is often helpful in establishing the extent of a loss of earning capacity, it is not the only way to establish this element of damage. See, e.g., Whigham v. Boyd, 97-0693, pp. 7-10 (La.App. 4th Cir.10/1/97), 700 So.2d 1163, 1167-68, writ denied, 97-2740 (La.1/16/98), 706 So.2d 979 (award based upon testimony by plaintiff, treating physician and economist); Carter v. Baham, 95-2126, pp. 14-16 (La.App. 4th Cir.10/9/96), 683 So.2d 299, 307-308 (same). In some cases, the plaintiff's own testimony, if credible and factually supported, will provide a sufficient basis for the factfinder's measurement of a loss of earning capacity. See, e.g., Smith v. Two R Drilling Co., 606 So.2d 804, 811 (La.App. 4th Cir.), writ denied, 607 So.2d 560 (La.1992) ("The award is substantiated by [amounts furnished by plaintiff] and no economist or expert was required to testify."); Sherlock v. Berry, 487 So.2d 555, 558 (La.App. 4th Cir.), writ not considered, 489 So.2d 912 (La.1986) (reasonable proof of future earnings loss "may even consist of the plaintiff's own testimony if accepted as truthful.").
In this case, as previously noted, Mr. Lederer's current employer has absorbed the primary economic loss resulting from the plaintiff's residual disability, but there can be no guarantee that this situation will continue. Accordingly, the loss of earning capacity could not be measured by comparing past income with his actual present and future wages, but an estimated value of the employer's "subsidy," i.e., the cost of the additional employee as well as the many modifications of other employees' tasks, might have been possible. Alternatively, vocational testimony concerning the effect of Mr. Lederer's disability on his salary potential with other employers in an "arms-length" job market would have enabled the jury to measure the loss. Absent such evidence, however, I must concur in the reversal of the award for loss of earnings and earning capacity.
NOTES
[1] See, LSA-Const. Art. 5, section 10(B).
[1] I find no legal authority nor evidentiary support for a susggestion that the Americans with Disabilities Act would require the extensive accommodations made by this employer, much less require that a subsequent purchaser of the business continue to pay an additional employee necessitated solely by Mr. Lederer's lack of mobility.