798 So.2d 285 (2001)
Ann T. Cooper LEAMAN
v.
CONTINENTAL CASUALTY COMPANY, et al.
No. 2000-CA-0292.
Court of Appeal of Louisiana, Fourth Circuit.
September 26, 2001.
Rehearing Denied November 16, 2001.
*287 Michael R. Allweiss, Max J. Cohen, Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P., New Orleans, LA, Counsel for Plaintiff/Appellee.
Charles M. Ponder, III, Hulse & Wanek, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES, Judge JAMES F. McKAY, III, and Judge DAVID S. GORBATY.
CHARLES R. JONES, Judge.
Defendants/Appellants, Kinko's of Georgia, Continental Casualty Company, James Treadway, Hogan Investment Properties, Inc., H.G.L. Rea, III, Rick Skelding, Jeff Meltzer and John Meltzer (hereinafter collectively referred to as Kinko's), appeal the jury verdict rendered on behalf of the Plaintiff/Appellee, Ann Cooper (hereinafter "Cooper"). The jury awarded Cooper general damages in the amount of $300,000 and special damages in the amount of $25,000 for damages she sustained as a result of a fall in a parking lot adjacent to a commercial building located at 3300 North Causeway Boulevard in Metairie, Louisiana. The judgment from the district court was subject to an assessment of 80% and 20% comparative fault for Kinko's and Cooper respectively. In its appeal, Kinko's argues six assignments of error. Following a review of the record, we hereby affirm the judgment of the district court.

FACTS
On January 13, 1994, Cooper filed a Petition for Damages in the Civil District Court for Orleans Parish alleging that Kinko's of Georgia, its insurer, Continental Casualty Company, and the various owners of the property located at 3300 North Causeway Boulevard were liable jointly *288 and in solido to her for injuries she sustained on February 2, 1993. According to the petition, Cooper tripped and fell on a sunken portion of the 17th Street parking lot after leaving the Kinko's Copy Center. She alleged that she stepped into a "V-shaped crack" in the parking lot, tripped and fell on her face, resulting in several severe lacerations and bruises to her face, lip and nose. Cooper also alleged that the V-shaped crack was located on the south side of the ten-space parking lot.
Notwithstanding her request for damages for pain and suffering, Cooper also requested hedonic damages because the incident has irrevocably interfered with her career as a colorist. Following a three-day jury trial, a verdict was rendered in favor of Cooper, subject to her comparative fault percentage of 20%. From this judgment, Kinko's filed the instant appeal.

GARDE
In its first assignment of error, Kinko's argues that it did not possess the requisite control over the at parking lot at issue to be held responsible for the plaintiff's damages. More specifically, Kinko's argues that the plaintiff failed to present any evidence to suggest that Kinko's leased the 17th Street parking lot from the owner, James Treadway, prior to the February 1993 accident. In the absence of such an lease agreement, Kinko's argues that they are no more than an adjoining landowners, which is insufficient to prove liability. Further, Kinko's argues that unless the plaintiff can show that Kinko's purposefully created the obstruction or intentionally inflicted damage to that portion of the parking lot complained of, then Kinko's cannot be held responsible for plaintiff's injuries. In the alternative, Kinko's argues that even if Kinko's were legally responsible for said damages the jury's assessment of comparative fault was erroneous. More particularly, Kinko's suggests that Cooper's comparative fault percentage should be increased because her residence has a number of depressions in the sidewalk leading to the front entrance to her home where she hosts various art exhibits and shows to art connoisseurs.
In rebuttal, Cooper argues that Kinko's did in fact have the requisite garde over the 17th Street parking lot. Cooper argues that Kinko's posted a banner promoting Kinko's services in the area where Cooper parked her car and she argues that Kinko's maintains a step leading from the side entrance to the parking lot, which Kinko's customers regularly used. In fact, Cooper argues that the on-duty manager for Kinko's, Milford Kelly, supervises a gentleman named Joseph Creighton, whose sole purpose is to clean the 17th Street parking lot several times a week. Additionally, Cooper argues that Kinko's owns and maintains a trash dumpster, which rests in one of the ten parking spaces and is located just several yards away from where the accident occurred. Moreover, Cooper argues that when the accident occurred, Kelly came to the scene, offered her ice for her bruises, asked if she needed medical attention, and then showed an insurance representative from Kinko's home office where the accident occurred so that the representative could take pictures and make a report. Therefore, Cooper argues that the jury was correct in concluding that Kinko's exercised garde over the unreasonable risk of harm in the 17th Street parking lot. Additionally, Cooper argues that Kinko's assertion that the comparative fault percentage is excessive is unfounded in light of the factual circumstances surrounding her fall. We agree.
We are responsible, not only for the damage occasioned by our own act, but *289 for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. LSA-C.C. art. 2317 (emphasis added). Custody, distinct from ownership, refers to a person's supervision and control over a thing. Alford v. Home Ins. Co., 96-2430 (La.App. 1 Cir. 11/7/97), 701 So.2d 1375. Garde is the obligation imposed by law on the proprietor of a thing, or on one who avails himself of it, to prevent it from causing damage to others; the fault of a person thus liable is based upon one's failure to prevent the person or thing from causing unreasonable injury to others. Baudoin v. McDermott, Inc., 93-2084 (La. App. 1 Cir. 10/7/94), 644 So.2d 799. Although ownership establishes a presumption of garde, it is rebuttable by the owner, and it is largely a question of fact. Alford, supra.
In Tyler v. Our Lady of the Lake Hosp., Inc., 96-1750 (La.App. 1 Cir. 6/20/97) 696 So.2d 681, the plaintiff tripped and fell on a portion of the curb in the median between the defendant hospital's premises and its ground level parking lot. The portion of ground where plaintiff fell was not in the designated crosswalk area that the defendant had reserved for its patrons to use when coming from the ground level parking lot to the main hospital facility. The plaintiff sued the hospital under the strict liability statute found in LSA C.C. art. 2317. Following a trial on the merits, the district court granted the defendant's Motion of Involuntary Dismissal because it concluded that the portion of ground where the plaintiff fell was not owned or maintained by the defendant hospital. In affirming the district court, our brethren at the First Circuit found that the plaintiff bears the burden of satisfying a two-fold test in strict liability cases under LSA C.C. art. 2317. The reviewing court found that the plaintiff must prove that (1) the thing causing the harm was defective; and (2) that the defendant being sued was the guardian or custodian of the defective thing and failed to protect the pedestrians or patrons from damage of injury caused by that defective thing. In Tyler, the plaintiff failed to satisfy the second part of this test.
In Migliori v. Willows Apartments, 98-1814 (La.App. 4 Cir. 2/3/99), 727 So.2d 1258, the plaintiff, a self-employed carpet installer, filed suit against the owner of an apartment complex when he slipped down a stairway in the apartment complex. The plaintiff also filed suit against the contractor and subcontractor because the complex was under renovation at the time of the incident.
The owner responded by filing a Motion for Summary Judgment. The district court granted summary judgment in favor of the defendant owner. In affirming the district court's judgment, this Court found that at the time of the plaintiff's fall, custody of the apartment complex had been transferred to the contractor and subcontractor. This Court further concluded that the owner's sporadic inspections of the contractor's work on the site did not constitute the requisite control for strict liability purposes. In essence, the contractor controlled the method and volume of work performed on the site and was legally aware of the condition of the stairway when the plaintiff fell.
Unlike the defendants in Tyler and Migliori, likewise, we find that the defendant herein, Kinko's, was the guardian or custodian over that portion of the parking lot containing the triangular or V-shaped depression. The fact that Kinko's agent, Kelly, took the initiative to care for Cooper following her fall, contacted Kinko's insurance representative following the incident and then directed him to the site of the accident to take pictures indicates that *290 Kinko's controlled and supervised the 17th Street parking lot. We also find that Kinko's decision to employ Creighton to clean and maintain the parking lot and the side entrance leading to the parking lot could lead a reasonable jury to conclude that Kinko's was responsible for her injuries.
As it relates to the jury's assessment of comparative fault, we find no merit to the Appellant's request to amend the jury's findings.
In any action for damages where a person suffers injury, death or loss, the degree or percentage of fault of all persons causing or contributing to injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a non-party, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. LSA C.C. art. 2323.
Apportioning of fault is a factual finding that is subject to the same manifest error analysis as that applied to a jury's finding of general damages, and will not be set aside absent abuse of the trier of fact's great, even vast discretion. Lederer v. Famous Entertainment, Inc., 98-2274 (La.App. 4 Cir. 5/12/99), 732 So.2d 1277, writ denied 99-1707 (La.9/24/99), 747 So.2d 1123; see also Vigh v. State Farm Fire & Cas. Ins. Co., 97-0381 (La.App. 4 Cir. 11/19/97), 706 So.2d 480, (jury's comparative fault assessment reinstated on rehearing).
Kinko's assertion that Cooper's percentage of fault should be increased because similar depressions like the one in the 17th Street parking lot exist adjacent to the entrance to her residence where she hosts art exhibits and art shows is immaterial. Having found that Kinko's has not presented any viable evidence of abuse of discretion by the jury, we opine that the jury's assessment of 20% comparative fault to Cooper is not erroneous.

UNREASONABLE RISK OF HARM
In its second assignment of error, Kinko's disputes that the condition of its parking lot at the North Causeway location created an unreasonable risk of harm to Cooper or any of its customers. Kinko's contends that the depression at issue was less than an inch deep and not of the size and magnitude sufficient to alert a reasonable property owner to take action in light of Louisiana's history of soil sinkage and countless potholes. Kinko's also argues that Cooper failed to present any evidence to establish that Kinko's was negligent in maintaining its parking lot-especially in light of the Louisiana Supreme Court's ruling in Boyle v. Board of Supervisors, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080 and Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362.
Additionally, Kinko's argues that the plaintiff did not sustain her burden of showing that the gravity and risk of harm outweighed the societal utility of the property involved. In essence, Kinko's argues that for the district court to require an establishment with over 500 stores nationwide to eliminate any and all variations in its countless number of concrete parking lots, driveways, sidewalks and streets would be not only a financial nightmare, but it would also constitute an abuse to the holdings in Boyle and Reed.
In response, Cooper contends that Kinko's, separate and distinct from the Kinko's of Georgia, owns no more than 50 stores, six of which are in the Louisiana area. Cooper also argues that the economic cost of maintaining this small parking lot could not outweigh the risk of injury *291 that could result to one of Kinko's 4,200 weekly customers. She also argues that the holdings in both Boyle and Reed are distinct from the instant case since there is no social utility to maintaining a pothole in excess of one inch deep in a parking lot regularly used by customers of all ages. Moreover, Cooper argues that Kinko's could have taken minimal preventive measures to mitigate its damages by posting a sign stating that only compact cars should be parked in the space where the accident occurred. She contends that had Kinko's posted a "Compact Cars Only" sign in this space, she would have seen the huge pothole and could have avoided the danger. Thus, she argues that the jury was correct in finding that the presence of the V-shaped pothole created an unreasonable risk of harm to Kinko's customers. We agree.
The unreasonable character of alleged property defect must be decided on particular facts and circumstances presented in each case; these factual findings shall not be disturbed absent manifest error. McAllister v. Coats, 96-1069 (La. App. 1 Cir. 3/27/97), 691 So.2d 305. While the manifest error standard shields the factual findings of the trier of fact on appellate review, the application of those facts to the final determination of whether a condition constitutes a defect that creates an unreasonable risk of harm to others should not be protected on appellate review by the manifest error rule, and is reviewed instead as a legal question. Green v. City of Thibodaux, 94-1000, 7-8 (La.App. 1 Cir. 10/6/95), 671 So.2d 399, 403, writ denied 95-2706 (La.2/28/96), 668 So.2d 366. A determination of whether a thing presents an unreasonable risk of harm should be made "in light of all relevant moral, economic, and social considerations." See Boyle, 685 So.2d at 1082.
The owner or person having custody of immovable property has a duty to keep such property in a reasonably safe condition. This person must discover any unreasonably dangerous conditions on the premises and correct the condition or warn potential victims of its existence. This duty is the same under both the strict liability theory of LSA-C.C. art. 2317 and the negligence theory of LSA-C.C. art. 2315.
See Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263, 1265 (La.App. 1 Cir.1984), writ denied, 462 So.2d 1248 (La.1985).
In Johnson v. Brookshire Grocery Co., Inc., 32-770 (La.App. 2 Cir. 3/1/00), 754 So.2d 346, writ denied, XXXX-XXXX (La.5/26/00), 762 So.2d 1107, a seventy-two year old plaintiff filed suit against a local grocery store after she stepped in a sunken portion of a crosswalk located directly in front of the store's entrance. The crosswalk was marked with yellow stripes on an asphalt surface. In affirming the defendant's liability, our brethren at the Second Circuit found that the size, location and depth of the indentation in the crosswalk differed significantly from the expansion joint discussed in both Boyle and Reed.[1] Since the defendant could reasonably expect its customers to use the crosswalk, the Johnson court found that the depression in the crosswalk created an obstacle for the defendant's customers and the court concluded that the effort and expense the defendant would incur to identify and correct the defect were minimal.
Likewise, we also find that the Supreme Court's holdings in both Boyle and Reed *292 are distinct from the instant case. In Boyle and Reed, the defect was an uneven expansion joint, which formed an integral part of the sidewalk. Further, the expansion joint, regardless of how it was positioned in the sidewalk, served a useful purposeit allows the concrete to expand and contract as the concrete heats and cools due to various weather conditions. Additionally, the Supreme Court noted that the costs of repair to the defective expansion joints in Boyle and Reed would be enormous for each defendant because the defendant would have to either eliminate all present and future defects or cease doing business.
Here, Kinko's did not realize a societal, moral or economic advantage to keeping the V-shaped depression in its parking lot. We also note that Kinko's, like the defendant Johnson, could reasonably expect its 4,200 customers to use the 17th Street parking lot on a regular basis, which would then give rise to its duty to warn customers of the defect or eliminate it all together. Having established that Kinko's of Georgia owns less that sixty stores in the Louisiana area, we opine that the expense Kinko's would incur to repair the defect would be outweighed by the risk such a defect would cause to its customers in light of Cooper's extensive injuries.

EXCESSIVE DAMAGES
Kinko's further argues that the general and special damages awarded to Cooper were excessive considering that her injuries were questionable and that she failed to follow the medical advice of several of her physicians. Kinko's also contends that Cooper, despite her alleged severe injuries, refused to undergo surgery for her bruised face and hand, but continued to paint and teach art classes; thereby failing to mitigate her damages. Kinko's further contends that Cooper's decision to have cosmetic surgery on her face, rather than submitting to ligament reconstruction for her left thumb diminished the credibility and legitimacy of her injuries.
Finally, Kinko's asserts that Cooper aggravated the temporomandibular joint (TMJ) dysfunction she allegedly sustained after the 1993 accident when she continued using the temporary splint or orthognatic when the orthodontist recommended that she began using the permanent splint to stabilize her temporomandibular joints.
In rebuttal, Cooper argues that the fall in the parking lot caused her severe injuries to her nose, face and lip. More specifically, she argues that she needs rhinoplasty to fix the external appearance of her nose and surgery on the septum to fix the internal damage to her nose. She also argues that she has difficulty with her vision and has constant problems with speaking, spelling, light sensitivity and debilitating headaches. She further argues that she suffers misalignment of the discs in her jaw (e.g. TMJ dysfunction). Additionally, Cooper asserts that Dr. Daniel Nuss, an ear, nose and throat surgeon, believed that she was leaking cerebral spinal fluid because of the severe head trauma she endured on the day of the accident. In light of the above injuries, Cooper argues that her entire career as a colorist has been totally altered. She argues that the record reflects that her fall in August 1993 has drastically interrupted the livelihood she has enjoyed as a childpainting and sculpting with special detail to light and color.
Cooper further argues that her decision to forego surgery should not result in a decrease to her general and special damages in light of the evidence in the record. She asserts that the unexpected family emergencies along with the questionable outcome of the surgeries recommended by *293 her treating physician show that she was not unreasonable in declining surgery.

a. Failure to Mitigate
The law seeks to fully repair injuries that arise from a legal wrong, but an accident victim has a duty to exercise reasonable diligence and ordinary care to minimize his damages after the injury has been inflicted. See Jacobs v. New Orleans Public Service, Inc., 432 So.2d 843 (La. 1983). (Emphasis added). Mitigation of damages is an affirmative defense, and the mitigation required must be reasonable. Taylor v. Tulane Medical Center, 98-1967, 98-1968, 98-1969 (La.App. 4 Cir. 11/24/99), 751 So.2d 949. The accident victim need not make extraordinary or impractical efforts, but must undertake those which would be pursued by a person of ordinary prudence under the circumstances. Meshell v. Lovell, 98-1192 (La.App. 3 Cir. 3/17/99), 732 So.2d 83.
The plaintiff in Meshell sustained severe injuries to her right shoulder and neck following an automobile collision. The plaintiff underwent surgery to her right shoulder to relieve an impingement; however, following the surgery, the plaintiff developed adhesive capsulitis. The orthopedic surgeon in Meshell testified that the plaintiff developed this condition because she refused to use her right shoulder by performing the exercises he recommended to her following the surgery.
Similarly, we find that Cooper's decision not to use a permanent orthodontic retainer or splint recommended by her orthodontist, Dr. Marshall Gottsgen, was error. Cooper was diagnosed in 1986 with bilateral mandibular retronathia (instability) with muscle spasm. In other words, Cooper's lower jaw was relatively shorter or was not as extended as her upper jaw. Dr. Gottsgen also noted that she had some muscle spasms in her jaw following the accident.
Dr. Gottsgen then testified that he constructed a temporary splint for Cooper to use to give her some relief from the pain in her mouth. He testified that he constructed the splint from an old retainer she had. However, Dr. Gottsgen testified that he did not intend for Cooper to use the splint for more than a year. The temporary splint, also known as a centric relation splint, was designed to snap over her upper teeth, and was sculpted to guide her lower jaw into its correct anatomic position upon closure. Dr. Gottsgen further testified that the permanent splint was not used, and he could not indicate why Cooper was reluctant to use the permanent splint. In fact, Dr. Gottsgen testified that Cooper continued having nighttime headaches, and photophobia problems with lights, but she still did not request the permanent splint.
In light of the record before us, we find that Cooper's failure to utilize the full advantage of Dr. Gottsgen treatment did in fact cause further aggravation of the injuries to her jaw. Like the plaintiff in Meshell, Cooper's actions prevented an earlier resolution or stabilization of the TMJ aggravation. Nevertheless, we decline to amend the jury's verdict since the jury was cognizant of Dr. Gottsgen testimony and Cooper's explanation of why she declined to follow such treatment. Further, the assessment of 20% comparative fault to Cooper appears to be clearly indicative of the jury's belief that she failed to mitigate her damages.

b. Failure to Undergo Surgery
An injured person is required to exercise ordinary prudence to minimize their damage. Barsavage v. State, Through Department of Transportation and Development, 96-0688 (La.App. 1 Cir. 12/20/96), 686 So.2d 957. To establish that an injured party has failed to mitigate *294 damages, the tortfeasor must demonstrate (1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm. See Hunt v. Long, 33-395 (La.App. 2 Cir. 6/21/00), 763 So.2d 811. Though, the plaintiff is not required to take any impractical efforts to minimize damages, he must take those steps that person of ordinary prudence would take under the circumstances. Meshell, 732 So.2d at 87 (emphasis added).
In Barsavage, the plaintiff sued the Department of Transportation and Development for injuries she sustained while traveling down a defective Louisiana road. The State argued that the plaintiff failed to mitigate her damages. In its reasons for judgment, the district court opined that the plaintiff failed to mitigate her damages when she declined to have surgery for her herniated disc and cervical fracture because the surgeon did not give her any guarantees for the surgery's success. The district court found no credibility in the plaintiff's excuse that she did not want to leave her only child to go to the hospital. The district court further noted that the surgeon forecasted no disability for the plaintiff following an early surgery rather than a future surgery. The district court also noted that the plaintiff did not take advantage of the free vocational counseling, rehabilitation training or physical therapy sessions offered to her pending surgery. In affirming the district court's judgment, the reviewing court concluded that the plaintiff's action reflected that she was not seeking the highest level of improvement that was reasonable under the circumstances.
In the instant case, Cooper testified that while she was enduring the psychological and physical impairments from her injuries, she was also overly concerned about the medical condition of her only son who was in a halfway house in Pittsburgh, Pennsylvania, suffering from kidney failure. Several years prior to the accident in question, Cooper donated one of her kidneys to her son; however, his body was rejecting the kidney and he was in extreme pain. Cooper testified that she went to Pittsburgh to be with her son though she could barely walk, was heavily medicated and in terrible pain. Even though her close friends tried to discourage her from traveling, she testified that she was more concerned about her son's condition than her own. When her son was transferred to Ochsner Hospital, Cooper testified that her son fell into a coma and was admitted into the Intensive Care Unit. She testified that she did not consider making an appointment with an optometrist or any other doctor a priority when her son was in the Intensive Care Unit (ICU), paralyzed, could not speak and had a number of tubes running into his body.
Though the plaintiff in Barsavage was also concerned for her only child, we find the circumstances in the instant case to be totally distinct from the circumstances in the facts in Barsavage. For this Court to require a mother of an only child to disregard the condition of her comatose son while he is a resident in ICU with no indication of possible improvement would be both unreasonable and unconscionable to any parent. The allocation of fault is not an exact science, or the search for one precise ratio; rather, it is an acceptable range and any allocation by the jury within that range cannot be clearly wrong. Riley v. Reliance Ins. Co., 97-0445 (La.App. 4 Cir. 11/19/97), 703 So.2d 158.
In Dufrene v. Willingham, 97-1239 (La. App. 5 Cir. 10/28/98), 721 So.2d 1026, writ denied 99-0032 (La.3/12/99), 739 So.2d 212, the reviewing court affirmed an 80/20 comparative *295 fault assessment against a truck driver who lost control of his vehicle when he swerved to avoid hitting a left-turning car partially blocking his lane of travel. "Just like in the quantum area, there is for sure a large amount of uncertainty in the allocation of fault. Our Coco (Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977)) decision pointed out that the ultimate determination by an appellate court as to whether a given judge or jury abused their "much discretion" as a matter of law is a judgment call." Dufrene, 721 So.2d at 1036 (Citing Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607). (Emphasis theirs). Accordingly, we find no abuse of discretion by the jury in the allocation of fault; thus, our judgment call affirms the jury's in light of all of the circumstances surrounding Cooper's injuries.

DECREE
For the foregoing reasons, the judgment of the district court is hereby affirmed.
AFFIRMED
BYRNES, C.J., Dissents With Reasons.
ARMSTRONG, J., Concurs in the Result.
McKAY, J., Concurs in the Result.
GORBATY, J., Dissents.
BYRNES, C.J., dissents with reasons.
I respectfully dissent. Under the Supreme Court's decision in Boyle v. Board of Supervisors of Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080, read together with the Supreme Court's decision in Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362, I would reverse the judgment of the trial court.
ARMSTRONG, J. concurs in the result.
I concur in the result reached in the majority opinion.
McKAY, J., concurs in the result.
I concur in the result reached in the majority opinion.
GORBATY, J., dissents.
I respectfully dissent for the reasons set forth by Chief Judge Byrnes.
NOTES
[1] The court also noted that there was a dispute about the size and depth of the depression, but found the dispute to be immaterial to the issue of whether the depression created an unreasonable risk of harm.